JOHN A. SAMPERI ET AL. *v.* INLAND WETLANDS
AGENCY OF THE CITY OF WEST HAVEN ET AL.
(14616)

PETERS, C. J., CALLAHAN, BORDEN, KATZ and PALMER, Js.

Argued June 1—decision released July 27, 1993

*Jonathan Katz,* for the appellants-appellees (plaintiffs).

*David H. Wrinn,* assistant attorney general, with whom, on the brief, were *Richard Blumenthal,* attorney general, and *Joseph Rubin,* assistant attorney general, for the appellee-appellant (defendant commissioner of environmental protection).

*Brian G. Enright,* assistant corporation counsel, for the appellee (named defendant).

*Maureen P. Williams,* with whom was *Stephen I. Small,* for the appellee (defendant Minor Farm Limited Partnership).

PETERS, C. J. The principal issue in this inland wetlands agency administrative appeal is the proper interpretation of General Statutes § 22a-41 (b)[1] of the Inland Wetlands and Watercourses Act (act),[2] specifically, the meaning of the requirement that a local inland wetlands agency shall not issue a permit after a public hearing unless the agency finds that "a feasible and prudent alternative does not exist." The defendant Minor Farm Limited Partnership (Minor Farm) filed an application

---

[1] General Statutes § 22a-41 (b) provides: "In the case of an [inland wetlands permit] application which received a public hearing, a permit shall not be issued unless the commissioner finds that a feasible and prudent alternative does not exist. In making his finding the commissioner shall consider the facts and circumstances set forth in subsection (a). The finding and the reasons therefor shall be stated on the record." This court, in *Gardiner* v. *Conservation Commission,* 222 Conn. 98, 109–10, 608 A.2d 672 (1992), determined that the requirements of the Inland Wetlands and Watercourses Act are as equally binding on local inland wetlands agencies as they are on the commissioner. See also General Statutes § 22a-42.

[2] The Inland Wetlands and Watercourses Act is found at General Statutes §§ 22a-36 through 22a-45a.

with the defendant Inland Wetlands Agency of the city of West Haven (agency) to build a residential subdivision on a wetlands area. After a public hearing, the agency granted the permit. The plaintiffs, John A. Samperi, Carol Samperi, William Johnson, Hazel Johnson and Edward J. Nycek, Jr., who are West Haven residents and the owners of property abutting the subject property, appealed the agency's decision to the Superior Court. The plaintiffs also named Timothy Keeney, the commissioner of environmental protection (commissioner), as a defendant in the appeal.[3] The commissioner appeared in this appeal in support of the plaintiffs' position. The trial court found that the plaintiffs were aggrieved by the agency's action and upheld the agency's decision to grant the permit. The plaintiffs appealed to the Appellate Court from the judgment of the trial court and the commissioner filed a cross appeal in support of the plaintiffs' position. We transferred the appeal to this court pursuant to Practice Book § 4023 and General Statutes § 51-199 (c). We affirm.

The relevant facts are as follows. Minor Farm filed an application with the agency on December 31, 1990, to conduct a regulated activity on wetlands in the city of West Haven. The regulated activity consisted of the construction of a sixty-one unit subdivision impacting approximately 0.8 acres of designated inland wetlands out of a nineteen acre parcel.[4] Minor Farm proposed to construct four filter fabric/stone envelope road crossings across the wetlands, reroute much of the natural drainage of the site into a drainage basin by building a three foot earthen dike to hold back the water and

---

[3] The plaintiffs also named the city of West Haven and the town clerk of West Haven as defendants in the appeal. They have not participated in this appeal.

[4] Soil scientist Frank Indorf, testifying as a consultant for Minor Farm on June 10, 1991, stated that the entire site contained two and one-half acres of inland wetlands.

utilizing a twelve inch drainage pipe to regulate the water flow, and fill in two small areas of wetlands on two of the sixty-one subdivided building lots. The agency accepted the application at its meeting on February 11, 1991. The agency thereafter conducted a walk through site review of the property and solicited and received the opinion of its city engineer. Throughout the entire application process, the agency received memoranda, reports and testimony from experts hired by the plaintiffs and by Minor Farm.

The plaintiffs intervened in the application proceedings in timely fashion pursuant to General Statutes § 22a-19.[5] Seventeen other neighbors also intervened to oppose the project.

At the public hearing, which commenced on June 10, 1991, and was continued and concluded on June 26, 1991, the agency heard over five hours of testimony, listened to more than thirty-five witnesses, including six experts and attorneys representing both sides, and compiled a transcript of more than eighty pages. Minor Farm, through its attorney, Stephen Small, its engineers, Anthony V. Giordano and Robert Lynn, and its soil and environmental consultant, Frank Indorf, first presented evidence to the agency in support of its application. After Small and Giordano characterized the proposed project in general, Indorf described in detail the use of geotextiles and stone as a permeable envelope over which the four road crossings on the wetlands

[5] General Statutes § 22a-19 provides in relevant part: "(a) In any administrative, licensing or other proceeding . . . any person, partnership, corporation, association, organization or other legal entity may intervene as a party on the filing of a verified pleading asserting that the proceeding or action for judicial review involves conduct which has, or which is reasonably likely to have, the effect of unreasonably polluting, impairing or destroying the public trust in the air, water or other natural resources of the state."

would be built.[6] Indorf stated that the road crossings would impact only 0.3 acres of wetlands and that the method used to cross the wetlands would mitigate the impact on the wetlands.[7] Lynn then discussed the rerouting of the storm water drainage into an existing drainage basin by adding a small three foot berm across the wetland body and utilizing a twelve inch pipe to control the drainage of water into an existing canal. He stated that this drainage plan would decrease and control the amount of drainage exiting the site. The agency commissioners assiduously questioned Minor Farm's witnesses about the rationale behind their chosen alternative, its impact on the wetlands and the possibility of altering their methods of development on the site, among other relevant matters.

---

[6] Anthony V. Giordano had submitted a memorandum to the agency on April 8, 1991, describing the geotextile materials and their use in the road crossings. Small, at the June 10, 1991 hearing, submitted a wetlands assessment report prepared by Environmental Resource Associates of Meriden, the firm of Frank Indorf, which analyzed the proposed project's impact on the site and depicted the use of the geotextile stone envelope in terms of the road crossings. At the June 26, 1991 hearing, Robert Lynn, an employee of Anthony Giordano and Associates, Minor Farm's consulting engineer, also described the use of the filter fabric/stone envelope in the construction of the four road crossings on the wetlands. He stated that the filter fabric/stone envelope "is placed in the road bed at the wetlands . . . and . . . allows the ground water flow which is taking place today through the wetland area to continue. So the road is not acting as a dam preventing, separating the two wetland areas it is crossing. The road is going over the top, the wetlands beneath are remaining continuous." In response to a question by agency commissioner Richard DeLeo concerning the impact of road salt from sanding operations on the wetlands, Lynn answered that "[t]his method [of filter fabric/stone envelope] construction will have no effect upon the wetlands, we're putting a road on top of the wetlands, and the salt that's put on top of the road surface isn't going to get into the wetlands beneath the road . . . . The storm drainage is gonna collect the storm water from the road surface, and lead it to the detention basin area."

[7] The wetland impact assessment report prepared by Environmental Resource Associates stated that "[t]he wetland crossings were thoroughly studied and there does not appear to be any alternatives that would provide less impacts on the wetland areas involved with this proposal, except not making the roadway crossings which is neither prudent nor practical."

The plaintiffs, their experts and a number of other witnesses, mostly neighborhood residents, then testified in opposition to the project. Those testifying in opposition included a licensed architect, a licensed professional engineer and surveyor, an ecologist, an excavation contractor and a manufacturing layout technician and conservationist. They proposed a number of alternatives to the proposed project and numerous alternative design modifications to the proposal. Among the alternatives presented by the plaintiffs, their experts and others opposed to approving the permit were alternative road layouts, the use of culverts rather than the filter fabric/stone envelope road crossings, revised subdivision layouts accommodating fewer homesites, and an alternative to purchase the property for open space.

The agency next offered Minor Farm an opportunity to reply to the opposition's comments. Through its experts and attorney, Minor Farm rebutted the opposition's suggested alternatives and responded to a myriad of questions addressed to them by the opposition.

Immediately after the public hearings had been completed, the agency commenced its deliberations on the application. Its deliberations centered on the impact on the wetlands of the four road crossings and the proposed drainage basin to reroute the storm runoff. The agency decided that night, by a three to two vote, to approve the permit with stipulated conditions.[8]

---

[8] The agency approved the permit with four specific conditions and ten general conditions. The four specific conditions were:

"1. That the Addendum received at the 6/26/91 Public Hearing for a 100 Year Hydrograph thru proposed basin, prepared by Anthony V. Giordano & Assoc. be reviewed for calculations and approved [by] the City Engineer;

"2. A[n] 18″ Pipe be installed at the large spillway going out to David Street;

"3. There be as little destruction of trees; and

The plaintiffs appealed to the trial court, which upheld the agency's decision. In deciding for the defendants, the trial court applied *Gagnon* v. *Inland Wetlands & Watercourses Commission*, 213 Conn. 604, 569 A.2d 1094 (1990), and searched the agency's record for evidence that would adequately support the agency's decision. The court determined that the agency had found and considered various alternatives as required by § 22a-41, and that the evidence amply warranted

"4. Hay Bales and Siltation Fences be installed and monitored by the Agency periodically."

The permit also included the following general conditions:

"1. That initiation of activity under this permit shall be within one year of its issuance, unless the time period is extended by the said Commission. Regulation Inland Wetlands and Water Courses Agency of the Conservation Commission City of West Haven, Section 7.2.

"2. That the Contractor's Acknowledgment Form be returned to this office prior to commencement of work.

"3. That the permittee shall notify the Inland Wetlands and Water Courses Agency of the Conservation Commission in writing immediately of the commencement of work and supply photographs at least 5" x 7" of original site if so specified by said Commission.

"4. That any material removed from wetlands or water courses during work herein authorized shall not be deposited on or in any wetlands or water courses of the city unless so specifically authorized by license.

"5. That the permittees shall immediately inform said Commission if problems involving sedimentation develop in the course of, or caused by, the work herein authorized.

"6. That this permit may be revoked if the permittee exceeds the conditions or limitations of this permit or has secured this permit through deception or inaccurate information. Regulations of the Inland Wetlands and Water Courses Agency of the Conservation Commission of West Haven, Sections 11.2 and 5.1.d.

"7. That this permit shall not be construed as relieving the permittee of the obligation to obey all applicable federal, state and local laws.

"8. That this permit is valid for one (1) year from commencement of work. If work is not completed at that time, applicant will appear before this agency and request an extension.

"9. That within two weeks of completion of the work, the permittee shall submit to said Commission photographs, no less than 5" × 7", of the work as built, or of portions of the work if so specified by said Commission.

"10. That the assignment or transfer of this permit to any other person or persons shall be reported immediately to the Conservation Commission."

approval of the application. The court, therefore, concluded that the agency had not acted illegally, improperly or in abuse of its discretion and dismissed the appeal.

The plaintiffs have appealed and the commissioner has cross appealed from the judgment upholding the agency's decision. The plaintiffs and the cross appellant claim that the trial court misinterpreted and misapplied the no "feasible and prudent alternative" standard of § 22a-41 (b) to the agency's actions because, in their view, the agency failed to consider feasible and prudent alternatives, or to find on the record that such alternatives do not exist. In addition, the plaintiffs raise two other issues as grounds for overturning the trial court's judgment. They claim that the trial court should have sustained their appeal because: (1) the agency ignored uncontroverted expert testimony and failed to consider the statutory criteria of § 22a-41 (a), which mandate the rejection of an application that impairs legislatively protected wetlands; and (2) the agency lacked jurisdiction to issue a wetlands permit to construct a dam.[9]

I

The plaintiffs and the cross appellant claim that the trial court, in upholding the agency's permit approval,

[9] The plaintiffs and the cross appellant raise an additional issue. They claim that the trial court improperly dismissed the appeal, because the agency failed to comply with its own local regulations, which require a written opinion from the agency. The plaintiffs made only a singular reference in their trial court brief to a defect in the agency's procedure concerning this issue and neither the plaintiffs nor the commissioner orally argued this issue before the trial court. The trial court's memorandum of decision never addressed or mentioned this issue. In addition, the plaintiffs, in their motion for articulation pursuant to Practice Book § 4051, did not request that the trial court make an articulation concerning this issue. By failing to develop the appropriate trial court record concerning this issue, the plaintiffs and the cross appellant have abandoned the issue. See *Barnes* v. *Barnes,* 190 Conn. 491, 493–94, 460 A.2d 1302 (1983). We, therefore, do not need to consider it further.

misinterpreted and misapplied § 22a-41 (b) of the act. Specifically, they contend that the agency did not comply with the requirement that a local inland wetlands agency shall not issue a permit after a public hearing unless that agency finds that "a feasible and prudent alternative does not exist." They assert that, in order to manifest compliance with the statute, the agency was required, not only explicitly to consider every alternative presented at the public hearing, but also to make an explicit finding that the alternative presented by the applicant was the only feasible and prudent alternative. Because the agency never made an express finding that no other feasible and prudent alternatives exist and because the record of the agency's deliberations does not show that each and every alternative presented by the opposition at the public hearing was explicitly considered, the plaintiffs and the cross appellant argue that the trial court should not have dismissed their appeal. We disagree.

In challenging an administrative agency action, the plaintiff has the burden of proof. *Anthony Augliera, Inc.* v. *Loughlin,* 149 Conn. 478, 482, 181 A.2d 596 (1962); see also *Red Hill Coalition, Inc.* v. *Conservation Commission,* 212 Conn. 710, 718, 563 A.2d 1339 (1989); *Lovejoy* v. *Water Resources Commission,* 165 Conn. 224, 229, 332 A.2d 108 (1973). The plaintiff must do more than simply show that another decision maker, such as the trial court, might have reached a different conclusion. Rather than asking the reviewing court to retry the case de novo; *Calandro* v. *Zoning Commission,* 176 Conn. 439, 440, 408 A.2d 229 (1979); the plaintiff must establish that substantial evidence does not exist in the record as a whole to support the agency's decision. *Feinson* v. *Conservation Commission,* 180 Conn. 421, 425, 429 A.2d 910 (1980).

In reviewing an inland wetlands agency decision made pursuant to the act, the reviewing court must sus-

tain the agency's determination if "an examination of the record discloses evidence that supports any one of the reasons given. . . . The evidence, however, to support any such reason must be substantial; [t]he credibility of witnesses and the determination of factual issues are matters within the province of the administrative agency. . . . This so-called substantial evidence rule is similar to the sufficiency of the evidence standard applied in judicial review of jury verdicts, and evidence is sufficient to sustain an agency finding if it affords a substantial basis of fact from which the fact in issue can be reasonably inferred. . . . [I]t imposes an important limitation on the power of the courts to overturn a decision of an administrative agency . . . and to provide a more restrictive standard of review than standards embodying review of weight of the evidence or clearly erroneous action. . . . The United States Supreme Court, in defining substantial evidence in the directed verdict formulation, has said that it is something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence. . . . The reviewing court must take into account [that there is] contradictory evidence in the record . . . but the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence . . . ." (Citations omitted; internal quotation marks omitted.) *Huck* v. *Inland Wetlands & Watercourses Agency,* 203 Conn. 525, 540–42, 525 A.2d 940 (1987).

In adhering to this "substantial evidence" standard for an inland wetlands agency appeal, we have held that it is improper for the reviewing court to reverse an agency decision simply because an agency failed to state its reason for its decision on the record. The review-

ing court instead "must search the record of the hearings before that commission to determine if there is an adequate basis for its decision." *Gagnon* v. *Inland Wetlands & Watercourses Commission,* supra, 611. In reaching this conclusion, we analogized cases and statutory language governing planning and zoning agencies to those governing inland wetland agencies and found the two statutory schemes to be either identical or extremely similar. Id., 606–609, 611. We also determined that public policy reasons make it "practical and fair" to have a trial court on appeal search the record of a "local land use body . . . composed of laymen whose procedural expertise may not always comply with the multitudinous statutory mandates under which they operate." Id., 611.

The plaintiffs and the cross appellant argue, nonetheless, that the statutory mandates of the act require the agency to create a record concerning each and every separate incursion or regulated activity in a wetland and to make an express finding that no feasible and prudent alternative exists before it can issue a permit. In support of their contention, they point to the specific language of § 22a-41 (b), which provides: "In the case of an application which received a public hearing, a permit shall not be issued unless the commissioner finds that a feasible and prudent alternative does not exist. In making his finding the commissioner shall consider the facts and circumstances set forth in subsection (a). The finding and the reasons therefor shall be stated on the record." We agree with the plaintiffs and the cross appellant that the statute does not permit an agency to grant a permit if the agency finds that a feasible and prudent alternative exists with regard to any of the incursions or regulated activities. We disagree, however, that the agency's decision-making process in this regard requires explicit consideration of each pro-

posed alternative and an explicit finding that all other alternatives are not feasible and prudent.[10]

In construing a statutory provision, we first look to its language, and if that language is plain and unambiguous, "we need look no further for interpretive guidance because we assume that the words themselves express the intention of the legislature." *Rhodes* v. *Hartford,* 201 Conn. 89, 93, 513 A.2d 124 (1986). Section 22a-41 (b) requires only that the commissioner make a singular "finding" that a feasible and prudent alternative does not exist. The use of the singular word "finding" is unambiguous. The statute does not require that multiple findings be made. If the legislature had intended to require the inland wetlands agency to rule out each and every possible alternative, it would have required "findings," rather than a "finding."

According to the plaintiffs' and the cross appellant's proposed interpretation, however, the agency would have to consider and rule on each and every possible alternative presented to it. The only practical way that an agency decision could survive a challenge under this interpretation would be for the agency explicitly to state its view on every alternative. Otherwise, the appealing party could argue that the agency's decision should be overturned because it overlooked an alternative. Such an elaborate agency process not only would require multiple findings to be made, but it would also contradict our holding in *Gagnon* v. *Inland Wetlands & Watercourses Commission,* supra, 611, that an

---

[10] For example, the plaintiffs and the cross appellant would require the agency, before approving Minor Farm's wetlands permit, to look at each one of the four wetland road crossings individually, consider Minor Farm's alternative of using a filter fabric/stone envelope and weigh that against each of the opponents' alternatives of using a culvert, altering the road layout, altering the density of the proposed development or leaving the site as open space and then explicitly to rule out each of the opponents' alternatives as infeasible and imprudent.

agency is not required to state all its determinations on the record so long as the record provides an adequate basis for the agency's decision.

Even if we go beyond the plain language of § 22a-41 (b) of the act, we are also "guided by the well defined principles of statutory interpretation that require us to ascertain and give effect to the apparent intent of the legislature." *State* v. *Blasko,* 202 Conn. 541, 553, 522 A.2d 753 (1987); *Rhodes* v. *Hartford,* supra, 93. The legislative purpose of the act is described in General Statutes § 22a-36, which contains the legislative finding regarding wetlands. The act was designed to protect and preserve the "indispensable and irreplaceable but fragile natural resource" of inland wetlands "by providing an orderly process to balance the need for the economic growth of the state and the use of its land with the need to protect its environment and ecology . . . ." General Statutes § 22a-36. Instead of banning all economic activities on wetlands, the legislature realized that a balance had to be struck between economic activities and preservation of the wetlands. *Brecciaroli* v. *Commissioner of Environmental Protection,* 168 Conn. 349, 354, 362 A.2d 948 (1975) ("[a]gainst that laudable state policy [of protecting wetlands] must be balanced the interests of the private landowner who wishes to make productive use of his wetland").

The legislature, therefore, created an orderly statutory scheme whereby each municipality is required to "establish an inland wetlands agency or authorize an existing board or commission to carry out the provisions of [the act]. . . ." General Statutes § 22a-42 (c). The local inland wetlands agency was given the sole authority to license and regulate wetland activities, consistent with the factors set forth by the legislature in

§ 22a-41.[11] By designing the statutory scheme in this manner, the legislature gave broad discretion to local agencies to oversee wetland activities. *Huck* v. *Inland Wetlands & Watercourses Agency,* supra, 551; *Gulf Oil Corporation* v. *Board of Selectmen,* 144 Conn. 61, 66, 127 A.2d 48 (1956); *Kaeser* v. *Conservation Commission,* 20 Conn. App. 309, 317, 567 A.2d 383 (1989); *Klug* v. *Inland Wetlands Commission,* 19 Conn. App. 713, 717-18, 563 A.2d 755, cert. denied, 213 Conn. 803, 567 A.2d 832 (1989). The legislature, in effect, has placed the initial and principal responsibility for striking the balance between economic activities and preservation of wetlands in the hands of the local authorities.[12] In striking that balance, the local inland wetlands agency

---

[11] General Statutes § 22a-41 provides: "(a) In carrying out the purposes and policies of sections 22a-36 to 22a-45, inclusive, including matters relating to regulating, licensing and enforcing of the provisions thereof, the commissioner shall take into consideration all relevant facts and circumstances, including but not limited to:

"(1) The environmental impact of the proposed action;

"(2) The alternatives to the proposed action;

"(3) The relationship between short-term uses of the environment and the maintenance and enhancement of long-term productivity;

"(4) Irreversible and irretrievable commitments of resources which would be involved in the proposed activity;

"(5) The character and degree of injury to, or interference with, safety, health or the reasonable use of property which is caused or threatened; and

"(6) The suitability or unsuitability of such activity to the area for which it is proposed.

"(b) In the case of an application which received a public hearing, a permit shall not be issued unless the commissioner finds that a feasible and prudent alternative does not exist. In making his finding the commissioner shall consider the facts and circumstances set forth in subsection (a). The finding and the reasons therefor shall be stated on the record."

[12] The 1987 amendments to the act were primarily enacted to require all municipalities to establish local inland wetlands commissions, to set forth a uniform and explicit standard for local agencies to follow—namely, that the local agency must find that a feasible and prudent alternative to wetlands intrusion does not exist—and to promulgate a coordinated time table for the permit application process. 30 S. Proc., Pt. 9, 1987 Sess., pp. 3115-16, remarks of Senator Michael Meotti; 30 H.R. Proc., Pt. 28, 1987 Sess., p. 10228, remarks of Representative Mary Mushinsky.

is required only to manifest in some verifiable fashion that it has made a finding of no feasible and prudent alternative. Although the agency may manifest its finding explicitly, in those cases in which its finding is implicit in its decision, the reviewing court has the responsibility to search the record for substantial evidence in support of the agency's action.

The plaintiffs and the cross appellant argue, nonetheless, that the trial court improperly construed the phrase, "feasible and prudent alternative," when it affirmed the agency's determination. We now turn to that contention. In order to issue a permit, the local inland wetlands agency must find that "a feasible and prudent alternative does not exist." General Statutes § 22a-41 (b). We have determined that an applicant for an inland wetlands permit has the burden of proving that it has met the statutory prerequisites for a permit. *Strong* v. *Conservation Commission,* 226 Conn. 227, 229, 627 A.2d 431 (1993); see also *Huck* v. *Inland Wetlands & Watercourses Agency,* supra, 553 n.18. The applicant, accordingly, must demonstrate to the local inland wetlands agency that its proposed development plan, insofar as it intrudes upon the wetlands, is the only alternative that is both feasible and prudent.

The evidentiary burden imposed on the applicant to demonstrate that its proposal is the only feasible and prudent alternative will ordinarily require an affirmative presentation to that effect. If only one alternative is presented, the inland wetlands agency can approve the application for a permit only if no other feasible and prudent alternatives exist. In practical terms, this will usually require that the applicant present evidence of more than one alternative to the local agency.[13]

[13] In contrast, an applicant who submits an application to a local zoning commission, pursuant to General Statutes § 8-3 (g), is required to submit only one site plan. The applicant does not have the burden either of submitting more than one alternative nor of proving that its submitted plan

Although we have not defined the phrase "feasible and prudent alternative" as used in the act, we have construed it in the context of the Environmental Protection Act of 1971 (EPA).[14] *Manchester Environmental Coalition* v. *Stockton*, 184 Conn. 51, 441 A.2d 68 (1981). In that case, we examined the question of who has standing to bring a legal action against any entity or person who unreasonably pollutes the environment under General Statutes § 22a-16. See id., 56–57. General Statutes § 22a-17 (a) uses the phrase, "feasible and prudent alternative," to describe the possible defenses available to a defendant who has been sued under the EPA. That subsection states: "When the plaintiff in any such action has made a prima facie showing that the conduct of the defendant, acting alone, or in combination with others, has, or is reasonably likely unreasonably to pollute, impair or destroy the public trust in the air, water or other natural resources of the state, the defendant may rebut the prima facie showing by the submission of evidence to the contrary. The defendant may also prove, by way of an affirmative defense, that, considering all relevant surrounding circumstances and factors, there is no *feasible and prudent alternative* to the defendant's conduct and that such conduct is consistent with the reasonable requirements of the public health, safety and welfare. . . ." (Emphasis added.) Relying on the United States Supreme Court's interpretation of federal environmental legislation in *Citizens to Preserve Overton Park, Inc.* v. *Volpe*, 401 U.S. 402, 91 S. Ct. 814, 28 L. Ed. 2d 136 (1971), we defined "feasible" to mean " 'as a matter of sound engineering.' " *Manchester Environmental*

is the most feasible and prudent alternative. See, e.g., *Carr* v. *Bridgewater,* 224 Conn. 44, 54–55, 616 A.2d 257 (1992); *Barberino Realty & Development Corporation* v. *Planning & Zoning Commission,* 222 Conn. 607, 613–14, 610 A.2d 1205 (1992).

[14] The Environmental Protection Act can be found at General Statutes § 22a-14 et seq.

*Coalition* v. *Stockton,* supra, 62, quoting *Citizens to Preserve Overton Park, Inc.* v. *Volpe,* supra, 411. We construed "prudent alternatives" as "those which are economically reasonable in light of the social benefits derived from the activity." *Manchester Environmental Coalition* v. *Stockton,* supra, 63.

We interpret in a similar manner the phrase, "feasible and prudent alternative," as used in the act. Thus, for a wetlands permit to issue, the local inland wetlands agency must determine that the alternative presented by the applicant is not only sound from an engineering standpoint but is also economically reasonable in light of the social benefits derived from the activity. See *Gardiner* v. *Conservation Commission,* 222 Conn. 98, 109–11, 608 A.2d 672 (1992). An alternative will be deemed to be a feasible and prudent alternative only if it meets both criteria.

The plaintiffs and the cross appellant argue, however, that because they proposed an alternative that they characterize as feasible and prudent, the agency should have rejected the application. Additionally, they contend that a wetlands permit can issue only if the local inland wetlands agency has specifically and explicitly considered and ruled out each and every other alternative as not being feasible and prudent. We disagree.

As a preliminary matter, the plaintiffs' and the cross appellant's belief that their alternative is feasible and prudent cannot be dispositive, because that judgment can be made initially only by the local inland wetlands agency. General Statutes § 22a-42 (c) ("the board or commission authorized by the municipality or district . . . shall serve as the sole agent for the licensing of regulated activities"). More importantly, *Gagnon* holds that an agency's statutorily required finding cannot be overruled simply because the agency's decision is not explicitly stated on the record. As long as a search of

the record reveals the basis for the agency's decision consistent with the substantial evidence standard enunciated in *Huck,* then the reviewing court must infer that the local wetlands agency made a finding that the applicant's alternative was the feasible and prudent alternative.[15] See *Gardiner* v. *Conservation Commission,* supra, 109–11. "Courts must be scrupulous not to hamper the legitimate activities of civic administrative boards by indulging in a microscopic search for technical infirmities in their actions." *Gulf Oil Corporation* v. *Board of Selectmen,* supra, 66. This cautionary advice is especially apt whenever the court is reviewing a decision of a local commission composed of laypersons. *Gagnon* v. *Inland Wetlands & Watercourses Commission,* supra, 611.

The substantial evidence standard of review in inland wetlands agency cases is met in this case. The agency listened to a considerable amount of testimony from innumerable witnesses, including laypersons, experts and attorneys on both sides. It diligently asked questions and engaged in ample deliberations. *Huck* v. *Inland Wetlands & Watercourses Agency,* supra, 543–44. The agency evaluated the evidence presented and appraised the credibility of the witnesses. We conclude, as did the trial court upon its review of the record, that the agency's decision to approve the permit constituted an implicit finding that no other feasible and prudent alternatives existed besides the Minor Farm proposal. The trial court properly applied the requirements of § 22a-41 (b).

---

[15] Alternatively, the plaintiffs and the cross appellant seem to imply that the agency, at a minimum, should have explicitly stated that "we find that a feasible and prudent alternative does not exist." We see no value in requiring an inland wetlands agency to make such a ritualistic assertion that would add nothing to the reviewing court's search of the record for substantial evidence to support an inland wetlands agency's determination.

## II

The plaintiffs next claim[16] that the trial court improperly dismissed their appeal because the agency ignored uncontroverted expert testimony and failed to consider the statutory criteria of § 22a-41 (a), which mandate specific inquiries for the environmental protection of legislatively protected wetlands. We disagree with both contentions.

First, the evidence before the agency in this case did not involve uncontroverted expert testimony. Unlike the situation in *Feinson* v. *Conservation Commission,* 180 Conn. 421, 429 A.2d 910 (1980), in which the agency disregarded testimony on a technically complex matter by the only expert who appeared at the hearing, without affording the expert an opportunity to rebut the agency's concerns, the present case included testimony by a myriad of experts. Minor Farm's experts testified and the opposition's experts testified. The experts disagreed as to the extent of the impact on the wetlands. That the commissioners assessed these various expert opinions with care is demonstrated by the three to two vote approving the application. Furthermore, as we stated in *Huck* v. *Inland Wetlands & Watercourses Agency,* supra, 542, "an administrative agency is not required to believe any witness, even an expert, nor is it required to use in any particular fashion any of the materials presented to it so long as the conduct of the hearing is fundamentally fair." See also *Manor Development Corporation* v. *Conservation Commission,* 180 Conn. 692, 697, 433 A.2d 999 (1980).

The agency also did not fail to consider the statutory criteria of § 22a-41 (a) in making its determination. That subsection provides: "In carrying out the purposes

---

[16] This claim is being raised only by the plaintiffs, and not by the commissioner.

and policies of sections 22a-36 to 22a-45, inclusive, including matters relating to regulating, licensing and enforcing of the provisions thereof, the commissioner shall take into consideration all relevant facts and circumstances, including but not limited to: (1) The environmental impact of the proposed action; (2) The alternatives to the proposed action; (3) The relationship between short-term uses of the environment and the maintenance and enhancement of long-term productivity; (4) Irreversible and irretrievable commitments of resources which would be involved in the proposed activity; (5) The character and degree of injury to, or interference with, safety, health or the reasonable use of property which is caused or threatened; and (6) The suitability or unsuitability of such activity to the area for which it is proposed." These criteria determine the factors that an agency must consider before issuing a permit that allows a regulated activity to be conducted in the wetlands, but, as we have indicated in our discussion of § 22a-41 (b), the statute does not require an inland wetlands agency explicitly to specify the factors that it has utilized in its evaluation of an application. As long as a search of the entire record reveals the basis for the agency's decision and supports reasonable inferences that the agency adhered to the factors enumerated in § 22a-41 (a), then the argument that the agency failed to apply the proper statutory criteria must be rejected. *Gagnon* v. *Inland Wetlands & Watercourses Commission,* supra.

The record in this case indicates that the agency considered the statutory criteria specified in § 22a-41 (a). For example, the agency's deliberations after the completion of the public hearing centered on the impact that the four road crossings and the drainage basin would have on the quality of the wetlands. In light of this evidence that the agency properly con-

sidered the environmental impact criteria pursuant to § 22a-41 (a) (1), the plaintiffs' appeal on these grounds is without merit.

## III

The plaintiffs' final claim[17] is that because the agency lacked jurisdiction to issue a wetlands permit to construct a dam, the trial court improperly dismissed their appeal of the agency's determination. We are unpersuaded.

We agree with the plaintiffs' assertion that before a dam can be constructed, the state department of environmental protection (DEP) must issue a permit for its construction. General Statutes § 22a-403.[18] It does not follow, however, as the plaintiffs assert, that the agency, in approving the wetlands permit, gave Minor Farm permission to construct a dam. The agency neither had such authority nor did it purport to exercise it.

We presume that agencies act within the scope of their authority and that permits that are conditioned upon compliance with other relevant federal, state and local regulations mean what they say. "[L]ocal inland wetland bodies are not little environmental protection agencies. Their environmental authority is limited to the wetland and watercourse area that is subject to their jurisdiction. They have no authority to regulate any activity that is situated outside their jurisdictional limits." *Connecticut Fund for the Environment, Inc.* v. *Stamford,* 192 Conn. 247, 250, 470 A.2d 1214 (1984). Nothing in the record suggests that the agency exceeded these bounds.

---

[17] This claim is not being raised by the commissioner.

[18] General Statutes § 22a-401 et seq. gives jurisdiction over the construction and regulation of dams to the commissioner. See also Regs., Conn. State Agencies § 22a-39-4.3.a (providing that the commissioner shall exclusively regulate the construction or modification of any dam).

Although there was some discussion during the public hearing as to whether the earthen dike of the drainage basin constituted a dam or a berm, the agency never explicitly or implicitly approved an application for a dam. Minor Farm's expert, Frank Indorf, stated that it would obtain a permit from DEP if the dike were deemed to be a dam.[19] The written notice of decision by the agency approving the issuance of the inland wetlands permit to Minor Farm never asserted that it was approving an application to construct a dam or even mentioned a dam. In addition, general condition number seven of the agency's notice of decision states "[t]hat this permit shall not be construed as relieving the permittee of the obligation to obey all applicable federal, state and local laws." The permit's approval, therefore, did not relieve Minor Farm of the obligation to seek and obtain prior approval if the "berm" were subsequently determined to be a "dam."

The judgment is affirmed.

In this opinion the other justices concurred.

---

[19] At the June 26, 1991 public hearing, the following discussion concerning the dike ensued:

"[Commission] Chairman William Clabby: I have one question for the developers O.K. And that does relate back to the berm and the statement that was made about going to DEP, that leaves a question in my mind. I don't know if there is a permit that is required by DEP in order to do that. That's something that uh.

"Frank Indorf: If a permit is necessary we will go to DEP and get the papers . . . .

"[Commission] Vice Chairman Richard DeLeo: And if it's gonna be a dam you need a permit from the DEP.

"Frank Indorf: It's not a dam . . . .

"[Commission] Chairman William Clabby: It's a berm."