[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
The plaintiff, Laurie Julian, appeals from the decision of the defendant, the Bloomfield inland wetlands and watercourses commission (the commission), granting the defendant, Cottage Grove Real Estate (Cottage Grove), a wetlands permit to conduct regulated activities on property owned by the defendants, Connecticut General Life Insurance Company (CIGNA) and Congen Properties, Inc. (Congen). The commission acted pursuant to General Statutes § 22a-42 (d)(1) and § 6.5 of CT Page 9295 the Bloomfield inland and watercourses regulations. The plaintiff appeals pursuant to General Statutes § 22a-43 (a). The court finds the issues in favor of the defendants. The facts essential to the court's decision are as follows. On November 9, 1999, Cottage Grove filed an application with the commission on behalf of CIGNA and Congen seeking a permit to conduct regulated activities in wetlands; in particular, proposing to develop a 612 acre parcel located on their property known as the CIGNA campus. The CIGNA campus is divided into the North Campus, the South Campus and the West Parcel. The North Campus consists of approximately 245 acres, the South Campus consists of approximately 365 acres, and the West Parcel consists of approximately 54 acres. The North Campus contains 82 acres of wetlands, the South Campus contains 41 acres of wetlands and the West Parcel contains 42 acres of wetlands.
Cottage Grove's proposal, as originally submitted, included the following regulated activities: "removal or deposition of material, construction, alteration, clearing and grubbing, grading, paving, and discharging of storm water within the wetlands, watercourses, flood plains, channel encroachment lines, FEMA 100-year flood hazard zones and upland review areas 100 feet from wetlands and 200 feet from watercourses." As noted, the CIGNA campus contains a total of 165 acres of wetlands and watercourses and the proposed activities included the filling of 6.33 acres of wetlands and vegetation control on 6.20 acres. The proposal also included, however, the creation of 8 acres of new wetlands and the enhancement of 15 acres of existing wetlands.
The proposed master plan of development for the CIGNA campus, as submitted, contained a variety of project components: an 18-hole golf course, a 275 room hotel and conference center with golf clubhouse, a combination of four single-family neighborhoods and one garden-style apartment residential complex, approximately 1.3 million square feet of replacement office space among eight buildings, and retail development of approximately 44,000 square feet.
On January 10, 2000, the commission held the first public hearing on the application. Speaking in behalf of defendant Cottage Grove, Dennis Lowry, a wetland scientist, gave an overview of the project and described the impacts of the various developments and the proposed wetland mitigation and restoration. Also speaking in behalf of Cottage Grove, Richard Moore, an engineer, described the storm water management plan for the project. Peter Castaldi, the wetlands agent for the town of Bloomfield, reviewed his staff report and discussed some of the alternatives in the report. In the staff report, Castaldi set forth specific possible alternatives that would reduce the impacts on the wetlands; in particular, in the area of the golf course. Castaldi recommended that the board withhold approval of the plan until the CT Page 9296 alternatives were considered, discussed and implemented if necessary. Following the reports, the public was allowed to question Cottage Grove and to make comments. After comments and questions were received from the public, the hearing was continued to February 8, 2000.
The continued public hearing was conducted on February 8, 2000. It was noted that Cottage Grove made some changes to the master plan in the application following the January 10, 2000, hearing. Harrison Minchew, the vice-president and senior golf course architect for Palmer Course Design Company, described the different considerations in designing a "championship" golf course, including accommodating the needs of the developer and the environment. Minchew stated that the design of the course was changed several times based on comments from the Environmental Protection Agency, the department of environmental protection, and the Army Corps of Engineers. Peter Clark, vice-president of CIGNA, described the various factors that were considered in developing the master plan and how CIGNA determined what was feasible and prudent based on the various alternatives it determined were available. Lowry presented some of the changes that had been made to the master plan since the last hearing. Castaldi presented his revised staff report and described what was discussed during a meeting with the town planner and Cottage Grove's attorney, engineer and environmental professional. Castaldi also made recommendations to the commission concerning approval of the master plan.
Following Castaldi's report, the hearing was opened for questions and comments from the public. Harvey Luce, a soil scientist, gave a presentation in behalf of the plaintiff According to Luce, there were feasible and prudent alternatives to this plan of development. Luce stated that "CIGNA doesn't have to build those buildings. They don't have to build those parking lots. They could build less buildings and they could build less . . . and subsequently less parking lots." Luce also stated that "some of the filling for the golf course I think is totally unnecessary and totally unwananted." Luce also commented on the mitigation plan. He contended that CIGNA could have a smaller development that would have less impact on the wetlands. The hearing was continued to February 29, 2000.
At the public hearing on February 29, 2000, Cottage Grove submitted revised plans to the commission. Specifically, Cottage Grove agreed to eliminate the filling of wetlands in parcel nine and to reduce the scope of the project by eliminating the construction of seven homes in parcel three. Cottage Grove also agreed to make minor changes to Hole #6 of the golf course. Following discussion of the revisions to the master plan, the commission extensively questioned Cottage Grove concerning the impacts of the development on specific portions of the property and CT Page 9297 possible alternatives. Cottage Grove's experts responded with explanations of why the alternatives were not feasible and prudent. The plaintiff was also permitted to question Cottage Grove and make comments on the proposed development. The hearing was again continued, to March 9, 2000.
At the continued hearing on March 9, 2000, Lowry summarized the changes to the plan and presented a drawing showing the relevant changes. Lowry also submitted a written summary of the project changes since the original application was filed on November 9, 2000. This indicates that the amount of proposed wetland filling was reduced from the original 6.33 acres to 3.89 acres, and the overstory clearing was reduced from the original 6.13 acres to 4.73 acres.[1] Following the hearing and discussion by the commission members; the commission voted unammously to approve Cottage Grove's application for a permit to develop the property in accordance with the amended master plan, subject to twenty-two conditions. These conditions include the requirement that, prior to commencing construction, Cottage Grove submit 1" = 40 scale construction plans for staff review and confirmation by the commission that the wetlands impacts shown on the 40 scale plans are consistent with the impacts shown on the plans submitted with the application.
The final decision was published on March 15, 2000. The plaintiff brought this appeal by timely service of process on March 29, 2000.
 Aggrievement
This court held a hearing on the issue of the plaintiffs aggrievement. Based on evidence presented at the hearing, including a stipulation of the parties, the court finds that the plaintiff owns property separated from the CIGNA campus by Maple Avenue, a public road. There is a presumption that landowners abutting a public road own to the middle of the road. Fuller v. Planning Zoning Commission, 21 Conn. App. 340, 345
n. 6 (1990). Accordingly, the plaintiffs property abuts the property that is the subject of the commission's decision. Further, based on the evidence, the court finds that the plaintiffs property is within a radius of ninety feet of wetlands which are involved in the commission's decision. The court finds that the plaintiff is aggrieved, therefore, pursuant to Conn. Gen. Stats. sec. 22a-43(a).
The court finds, further, that the plaintiff has standing to appeal based on the provisions of Conn. Gen. Stats. sec. 22a-19(a), which allows any person to intervene as a party in order to assert that the commission's decision concerns conduct "which is reasonably likely to have the effect of unreasonably polluting, impairing, or destroying the public trust in the air, water or other natural resources of the state." CT Page 9298
 The Plaintiffs Appeal
In support of her appeal, the plaintiff advances five arguments: (1) Evidence in the record does not support a finding by the commission that there is no reasonable and prudent alternative to the project, as required by statute and applicable regulations; (2) the commission's finding that Cottage Grove's regulated activities would not unreasonably pollute, impair or destroy the public trust in air, water or other natural resources of the state was not supported by substantial evidence; (3) the submission of 100 scale plans rather than 40 scale plans prevented the commission from making a fair and informed decision; (4) the commission deprived the plaintiff of due process of law by allowing the submission of 40 scale drawings without providing the opportunity for the public to review the drawings; and (5) Cottage Grove did not present evidence of volumetric amounts of material to be removed or deposited as required by regulations.
 General Standard of Review by the Court
Before addressing the specific arguments advanced by the plaintiff, it is useful to summarize the general standards to which this court must adhere in reviewing the commission's decision.
A basic principle of administrative law is that the scope of the court's review of a decision by an administrative agency, such as the commission, is very limited. "Judicial review of an administrative agency decision requires a court to determine whether there is substantial evidence in the administrative record to support the agency's findings of basic facts and whether the conclusions drawn from those facts are reasonable. . . . Our ultimate duty is to determine, in view of all of the evidence, whether the agency, in issuing its order, acted unreasonably, arbitrarily, illegally or in abuse of its discretion." (Citations omitted; internal quotation marks omitted.) CadlerockProperties Joint Venture. L.P. v. Commissioner of Env. Protection,253 Conn. 661, 676, 757 A.2d 1 (2000).
Substantial evidence is "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence. . . ." (Citations omitted; internal quotation marks omitted.) Id., 677.
"In challenging an administrative agency action, the plaintiff has the burden of proof. . . . The plaintiff must do more than simply show that another decision maker, such as the trial court, might have reached a different conclusion. . . . [T]he plaintiff must establish that CT Page 9299 substantial evidence does not exist in the record as a whole to support the agency's decision." (Citations omitted.) Samperi v. Inland WetlandsAgency, 226 Conn. 579, 587 (1993).
"In reviewing an inland wetlands agency decision made pursuant to the act, the reviewing court must sustain the agency's determination if an examination of the record discloses (substantial) evidence that support any one of the reasons given. . . . the credibility of witnesses and the determination of factual issues are matters within the province of the administrative agency." (Internal quotation marks omitted.). Id. 587-588.
These familiar principles of our law present a formidable obstacle to the overturning by the court of the factual findings and conclusions of an administrative agency such as the defendant commission.
 Reasonable and Prudent Alternatives
General Statutes § 22a-42a (d)(1) provides, in pertinent part, that "[i]n granting, denying or limiting any permit for a regulated activity the inland wetlands agency, or its agent, shall consider the factors set forth in section 22a-41." The factors set forth in section22a-41 (a) include the existence of any feasible and prudent alternatives to the proposed activity which would cause less or no environmental impact to the wetlands or watercourses. General Statutes § 22a-41(b) provides that "a permit shall not be issued unless the commissioner finds on the basis of the record that a feasible and prudent alternative does not exist." The Bloomfield inland wetlands and watercourses regulations contain essentially the same provisions regarding the feasible and prudent alternatives analysis. In addition, section 5.2(p) provides that "all applications shall include alternatives considered by the applicant, and written reason why the proposed activities were chosen. These alternatives shall be diagramed on a site plan or drawing."
Our Supreme Court has considered and interpreted the statutory provisions in Samperi v. Inland Wetlands Agency, supra, 226 Conn. 579. "[A]n applicant for an inland wetlands permit has the burden of proving that it has met the statutory prerequisites for a permit . . . The applicant, accordingly, must demonstrate to the local inland wetlands agency that its proposed development plan, insofar as it intrudes upon wetlands, is the only alternative that is both feasible and prudent." Feasible is defined "to mean as a matter of sound engineering." Prudent alternatives are defined as "those which are economically reasonable in light of the social benefits to be derived from the activity." "Thus, for a wetlands permit to issue, the local inland wetlands agency must determine that the alternative presented by the applicant is not only CT Page 9300 sound from an engineering standpoint but is also economically reasonable in light of the social benefits derived from the activity. . . . An alternative will be deemed to be a feasible and prudent alternative only if meets both criteria." (Citations and internal quotation marks omitted.) Id., 593-595.
The plaintiff argues that Cottage Grove failed to comply with the applicable statutes and regulations by failing to present sufficient evidence that no feasible and prudent alternative existed with respect to each of the individual impacts that the project would have on the wetlands. In her brief and argument to the court, the plaintiff does not take issue with any particular judgment reached by Cottage Grove (or by the commission) with respect to an alternative to the project as a whole or to a component of it. Rather, the plaintiff contends that alternatives to the various components of the plan were not sufficiently presented and discussed. This contention may not be sustained.
This court's review of the record shows that a substantial portion of the presentation by Cottage Grove at the public hearing was devoted to an analysis of the details of its master plan of development and alternatives that it had considered and rejected. Furthermore, the commission, its staff, and members of the public suggested alternatives to various components of the master plan, either explicitly or implicitly, during the course of the hearing, and Cottage Grove either adopted those suggestions or gave reasons for rejecting them.
Initially, Cottage Grove described and discussed possible alternatives in the narrative which accompanied the master plan. This narrative is an eighty-one page document with voluminous appendices, diagrams and charts; record Item 4D. Possible alternatives to the project as a whole that were considered included (a) maintaining the status quo, (b) building new facilities without developing the surrounding land, (c) an outright sale of some of the property to offset the cost of demolishing the old facilities and building new ones, and (d) removal of its business from the site altogether. Each of these alternatives is discussed and reasons given why they were rejected as not feasible and prudent. These reasons included CIGNA's assessments of its need for new office buildings, the needs of the town of Bloomfield, the demands of existing and projected real estate markets, and the needs of the environment.
In addition to describing and discussing alternatives to the project as a whole, the narrative includes a discussion of the specific impacts of the golf course on the wetlands (holes 2, 3, 4, 5, 6, 7, 8, 10, 14, 16, 17 18) and contains drawings of the proposed layout and previous alternative layouts for holes 3, 5, 7 14. The narrative also contains a specific discussion of the non-golf course project components and CT Page 9301 alternative/avoidance analysis. In particular, it describes the five areas on the site where residential development is proposed, the impacts of each development on wetlands and the lack of feasible alternatives to these impacts. In another section, the narrative describes the office, commercial, and hotel development components, the impacts of each development on the wetlands and the lack of feasible alternatives to these impacts.
After submitting the application to the commission, alternatives were discussed with the commission, the town wetlands agent, and the town planner. As previously noted, Peter Castaldi, the town wetlands agent, presented written alternatives to the impacts proposed in the master plan for consideration by the commission. Cottage Grove responded to the report by Castaldi, and either agreed to change the plans as suggested or explained why an alternative suggested by Castaldi was not feasible and prudent. In particular, Cottage Grove made changes in the design of ten of the golf holes and changes to five non-golf related development projects, based on suggestions of Castaldi and the commission. In the court's view, these modifications in the master plan, including the substantial reduction in the area of wetlands affected by the project — from 6.33 acres to 3.89 acres — indicate that not only were numerous alternatives reviewed, but several of them were implemented as prudent and feasible alternatives having a significantly reduced impact on the wetlands.
Although the record shows that, at the close of the public hearing, the commission staff Mr. Castaldi in particular, continued to believe that more alternatives should be pursued, Castaldi agreed that many alternatives had been presented and discussed. The record also shows that the commission members reached the determination that there was sufficient appropriate consideration of alternatives, both general and specific. Chairman Colman, for example, stated during deliberations following the public hearing that "the applicant has at least convinced me that they have one, on their own, looked at a variety of alternatives and two, responded to a variety of suggestions made during the public hearing process." Another member of the commission stated that "[w]hen you consider the scope of this, there are certain things that could be done and can't be done. Considering the impacts that are being made against the impacts that could have been made, and considering that overall site will still look like, I think that all the feasible and prudent alternatives have been taken care of. It's difficult to keep in mind feasible and prudent because the first thing that comes to mind is money. They are trying to save money. I'd like to think we are making our decision based on the impact and the impacts are minimal."
In short, the record contains ample evidence that general and specific CT Page 9302 alternatives to the project's impact on wetlands were considered and discussed before the commission, along with the applicant's reasons for not adopting those considered not to be feasible and prudent. Cottage Grove presented expert testimony and evidence in support of its position, and the commission had the benefit of the opinions of its own expert and its experienced staff. Although the plaintiff also presented the testimony of her own expert in opposition, the commission was not bound to accept that testimony or to conclude that it devalued evidence presented by Cottage Grove. Indeed, as noted, it was the commission's duty to weigh all of the evidence before it, conflicting or not, and make the necessary findings of fact, including in this case whether there were prudent and feasible alternatives to the project that would have less impact on the wetlands.
The plaintiffs argument on these issues is directed in large part at the form of the commission's decision. In this regard, the commission's decision did not explicitly include a finding that no feasible and prudent alternative to the project as a whole existed, nor did it include findings concerning alternatives to specific components of the project. In Samperi v. Inland Wetlands Anency, supra, 226 Conn. 589-590, the Supreme Court held that although the commission may not approve an application if a feasible and prudent alternative exists with regard to any one of the impacts on the wetlands that the project may have, the statute does not require that the commission make individual findings with respect to each such impact. Furthermore, "an agency's statutorily required finding (regarding alternatives) cannot be overruled simply because the agency's decision is not explicitly stated on the record. As long as a search of the record reveals the basis for the agency's decision consistent with the substantial evidence rule . . . then the reviewing court must infer that the local wetlands agency made a finding that the applicant's alternative was the feasible and prudent alternative." (Citation and internal quotation marks omitted.) Id., 595-596. After a careful review of the record, as summarized above, the court finds that there is ample substantial evidence to support the commission's implicit determination that there is no feasible and prudent alternative to Cottage Grove's master plan, as revised during the course of the commission's proceedings. The plaintiffs arguments in this regard may not, therefore, be sustained. Samperi v. Inland Wetlands Agency, supra, 226 Conn. 587-588.
 Unreasonable Pollution
In its decision, the commission expressly stated its finding that the project will not have the effect of unreasonably polluting or impairing the public trust in the air, water or other natural resources of the state. Such finding is required by Conn. Gen. Stats. sec 22a-19(b). The CT Page 9303 plaintiff argues that there was insufficient evidence to support this finding. The court disagrees.
The plaintiff has the burden of showing that the commission's decision was not supported by substantial evidence. The plaintiff contends that her expert, Dr. Harvey Luce, a soil scientist, did present evidence that the activities were reasonably likely to unreasonably pollute, impair or destroy the public trust in the air, water or other natural resources of the state. Cottage Grove presented evidence to the contrary. In particular, Cottage Grove's expert, Dennis Lowry, a wetland scientist, responded to Dr. Luce's testimony and written comments. Additionally, Cottage Grove's experts provided voluminous reports to the commission regarding the impacts of the project and responded to questions from the commission during four public hearings.
In Samperi v. Inland Wetlands Agency, supra, 226 Conn. 579, the administrative hearings "included testimony by a myriad of experts." The court held that "an administrative agency is not required to believe any witness, even an expert, nor is it required to use in any particular fashion any of the materials presented to it so long as the conduct of the hearing is fundamentally fair."
The commission heard evidence from the plaintiffs expert and Cottage Grove's experts. It was the commission's responsibility to assess the testimony of the different experts and determine which were the more credible. The fact that the experts disagreed on the environmental impacts of the project, therefore, does not invalidate the commission's ultimate finding that Cottage Grove's activities would not unreasonably pollute or impair the natural resources of the state. The court concludes that the commission's decision in this regard is supported by substantial evidence on the record, and the court may not, therefore, substitute its judgment for that of the commission.
 Plan Scale
The plaintiff argues that the commission was unable to make a fair and informed determination of the issues because Cottage Grove was permitted to submit plans drawn to 1" = 100' scale rather than 1" = 40' scale, the latter scale being required by the regulations. The plaintiff also argues that the commission granted Cottage Grove permission to use the reduced scale without a public hearing and thereby denied plaintiff due process of law. These arguments are without merit.
The plaintiff points to nothing in the record that would indicate that the commission's decision was not fair or was based on insufficient information as a result of the reduced scale. The commission conducted CT Page 9304 four public hearings, engaged in extensive discussions concerning alternatives to the plan and reviewed numerous reports submitted by environmental experts and engineers. In making its decision, the commission determined "that there has been sufficient data and information presented to make this decision; that all relevant facts and circumstances have been considered. . . ." The plaintiff has not sustained her burden of proving that the commission was unable to make a fair and informed decision as a result of the scale on the drawings submitted by Cottage Grove.
The plaintiff's due process argument is equally flawed. The process by which reduced scale plans were submitted with Cottage Grove's application complied with applicable regulations. Plans submitted with wetlands permit applications must comply with a checklist, which includes the requirement that plans to be drawn to 1' = 40' scale. Section 5.2(H) of the regulations provides, however, that "[s]ome information on the checklist may or may not apply to certain types of development. The Wetlands Agent shall determine which sections apply to all applications." Cottage Grove sought permission from the commission at a meeting on June 21, 1999 to submit a Master Development Plan that would comply with the checklist except it would be 100 scale rather than 40 scale. Bloomfield's wetland agent, Peter Castaldi stated that he "would feel comfortable doing that as long as it's understood that the detailed 40 scale plans have to come before the Wetlands Commission for approval." The commission thereupon granted permission to Cottage Grove to utilize the reduced scale in its submission.
When the commission ultimately approved the application, it did so subject to the conditions, among others, that Cottage Grove submit final plans drawn to the required 40 scale and that the commission and its staff determine that the wetlands impacts shown on the enlarged scale plans be consistent with the impacts shown on the reduced scale plans that were approved. In the absence of such determination, the application would fail final approval.
In Gardiner v. Conservation Commission, 222 Conn. 98 (1992), the Supreme Court held that the imposition of conditions requiring the submission of additional information before final approval does not deny an appellant due process even though the additional information is not subjected to the scrutiny of a public hearing. The rule in Gardiner
applies with particular force to the present case. Here, the additional information that is, the enlarged scale plans — is simply a recasting of information already subjected to the scrutiny of a public hearing. And, of course, the plaintiff and her witnesses appeared at that hearing and actively participated. CT Page 9305
The court has examined the plaintiffs arguments on this point and finds no denial of her due process rights.
 Volumetric Amounts of Fill
The plaintiffs argument that the volumetric amounts of material to be removed or deposited were not provided is contradicted by the evidence in the record. Cottage Grove provided the volumetric amounts of material to be deposited in the Master Plan. (ROR, Item 30, p. C-51; Item 46, p. C-51; Item 70, p. C-50.) Accordingly, the court finds that cottage Grove's application contained the volumetric amounts of material to be deposited as required by the regulations.
 Conclusion
As stated earlier in this decision, the court's "ultimate duty is to determine, in view of all of the evidence, whether the agency, in issuing its order, acted unreasonably, arbitrarily, illegally or in abuse of its discretion." Cadlerock Properties Joint Venture, L.P. v. Commissioner ofEnv. Protection, supra, 253 Conn. 676. Based on a review of the whole record and a careful consideration of the plaintiffs arguments, the court concludes that the commission acted reasonably and that its decision is supported by substantial evidence. The plaintiffs appeal is, therefore, dismissed.
Maloney, J.