[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
STATEMENT OF THE APPEAL
The plaintiffs, Frances and John Hickey, appeal from a decision of the defendant, Environmental Protection Board of the City of Stamford (board), acting in its capacity as an Inland Wetlands and Watercourses Agency, to issue a permit (Application No. 9421) to conduct a "regulated activity": to wit, alteration, deposition of materials, and construction of a library facility with a parking lot and a drainage system. The decision of the board followed a public hearing held on August 18, 1994. Also named as defendants are the City of Stamford, The Department of Environmental Protection of the State of Connecticut, and the Ferguson Library, Turn of River Branch (Ferguson Library). The board's decision was made pursuant to General Statutes §22a-36, et seq. The plaintiffs have appealed under General Statutes § 22a-43.
PROCEDURAL HISTORY
The board published notice of its decision in the StamfordAdvocate on September 22, 1994. (Appeal, Exhibit C.) The plaintiffs served the appeal on the defendants on October 6, 1994. (Sheriff's Return.) The appeal was filed with the superior court on October 7, 1994. The board filed the return of record dated February 28, 1995, and a supplemental return of record on April 17, 1995. The plaintiffs filed their brief on May 4, 1995. The board filed its brief on July 12, 1995.
On July 18, 1994, the Ferguson Library filed an application for a permit to conduct regulated activities, the construction of a library, on a 28-acre site. (Return of Record [ROR], Item 35: Application For a Permit to Conduct Regulated Activities.) The site contains 78,930 square feet of wetlands or floodplain. (ROR, Item CT Page 14550 35.) The permit would temporarily affect 150 square feet of wetlands by moving an existing drainage pipe, but would be restored to wetland status. (ROR, Item 35.) The permit would allow 4,900 square feet of buffer area to be permanently affected. (ROR, Item 35.) The plaintiffs appeal the decision of the board on the grounds that the board acted illegally, arbitrarily and in abuse of its discretion in the following ways: "a) [s]aid decision was made without a proper exploration of alternatives to the proposed conduct of the applicant which might have enhanced environmental quality or had a less detrimental effect upon the environment; b) [s]aid decision was made without proper exploration of alternative sites for the proposed project which may have been available to the applicant; c) [s]aid decision was made without adequately taking into consideration the character or degree of injury to or interference with the public safety and health which will result from the activities intended by the applicant; d) [s]aid decision was made without the [board] making a finding that a feasible and prudent alternative did not exist." (Appeal, ¶ 12.)
JURISDICTION
I. Aggrievement
"General Statutes § 22a-43 governs the procedure for appeals from wetland and watercourse regulatory decisions. It provides, in general terms, that certain persons may appeal from inland wetland and watercourse actions. Those persons are the state commissioner of environmental protection, classically aggrieved persons and owners or occupiers of land abutting or within ninety feet of the wetlands or watercourse involved." Klug v. Inland WetlandsCommission, 19 Conn. App. 713, 715, 563 A.2d 755, cert. denied,213 Conn. 803, 567 A.2d 832 (1989).
At a hearing before the court on August 30, 1995, the plaintiffs provided evidence of their ownership of the property located at 107 Vine Road which abuts the parcel that was the subject of the board's decision. (Plaintiffs' Exhibit A.) Accordingly, this court found aggrievement pursuant to General Statutes § 22a-43.
II. Timeliness
Under General Statutes § 22a-43, an appeal must be commenced "within the time specified in subsection (b) of section8-8 from the publication of such regulation, order, decision or CT Page 14551 action." General Statutes § 8-8(b) provides that an appeal must be commenced within "fifteen days from the date that notice of the decision was published." As discussed above, notice of the decision was published on September 22, 1994, and service of process of the appeal was made on October 6, 1994. Therefore, the appeal is timely under § 22a-43.
"An appeal taken under § 22a-43 requires that notice `shall be served upon the inland wetlands agency and the commissioner.'" Klug v. Inland Wetlands Commission, supra,19 Conn. App. 715. Service was made on the City of Stamford, The Ferguson Library, Timothy Keeny, Chairman of the Environmental Protection Board of the State of Connecticut and on William Morris, Chairman of the Environmental Board of the City of Stamford on October 6, 1994.
SCOPE OF JUDICIAL REVIEW
"In reviewing an inland wetlands agency decision made pursuant to the act, the reviewing court must sustain the agency's determination if `an examination of the record discloses evidence that supports any one of the reasons given . . . . The evidence, however, to support any such reason must be substantial; the credibility of witnesses and the determination of factual issues are matters within the province of the administrative agency . . . . evidence is sufficient to sustain an agency finding if it affords a substantial basis of fact from which the fact in issue can be reasonably inferred.' . . . [I]t is improper for the reviewing court to reverse an agency decision simply because an agency failed to state its reason for its decision on the record. The reviewing court instead `must search the record of the hearings before that commission to determine if there is an adequate basis for its decision.'" Samperi v. InlandWetlands Agency, 226 Conn. 579, 587-88, 628 A.2d 1286 (1993).
The plaintiffs base their appeal on four grounds: the decision was made without a proper exploration of alternatives to the proposed conduct of the applicant which might have enhanced environmental quality or had a less detrimental effect upon the environment; the decision was made without proper exploration of alternative sites for the proposed project which may have been available to the applicant; the decision was made without adequately taking into consideration the character or degree of injury to or interference with the public safety and health which will result from the activities intended by the applicant; and CT Page 14552 the decision was made without the [board] making a finding that a feasible and prudent alternative did not exist." (Appeal, ¶ 12.) The defendants respond that there is substantial support on the record for granting the permit in accordance with General Statutes § 22a-41(a).
The applicant's board-approved permit provides, "[p]ermission is hereby granted for the construction of a portion of a paved parking area, drainage improvements, and site grading within buffer/setbacks to designated wetland areas; construction of a portion of a relocated existing stormwater drainage system within designated wetlands; and the discharge of stormwater runoff." (ROR, Item 2: EPB Permit).[1] The board stated its reasons for granting the permit in the findings of Louis Levine, board Vice Chairman, see infra, pp. 9-10, 10-11, 15-16. (ROR, Item 3: Findings of Louis Levine, EPB Vice-Chairman.)
A. Alternative Sites
In granting a permit, the board must consider "all relevant facts and circumstances, including but not limited to: 1. The environmental impact of the proposed action; 2. The alternatives to the proposed action; 3. The relationship between short-term uses of the environment and the maintenance and enhancement of long-term productivity; 4. Irreversible and irretrievable commitments of resources which would be involved in the proposed activity; 5. The character and degree of injury to, or interference with, safety, health or the reasonable use of property which is caused or threatened; 6. The suitability or unsuitability of such activity to the area for which it is proposed." General Statutes § 22a-41 (a). "A permit shall not be issued unless the commissioner finds that a feasible and prudent alternative does not exist." General Statutes §22a-41 (b). The City of Stamford regulations provide further that the board shall consider "the alternatives to the proposed action including a consideration of alternatives which might enhance environmental quality or have a less detrimental effect, and which could feasibly attain the basic objectives of the activity. This should include but is not limited to . . . the alternative of requiring actions of different nature [sic] to provide similar benefits with different environmental impacts, such as using a different location for the activity." Inland Wetland and Watercourses Regs., City of Stamford § 7.5d(ii).
The plaintiffs contend that the board could not have made a CT Page 14553 finding that no feasible and prudent alternative exists without considering other municipally owned property. The plaintiffs cite two cases for their proposition that the board should have considered other municipal property; Red Hill Coalition, Inc. v.Conservation Commission, 212 Conn. 710, 726, 536 A.2d 1339 (1989) and Hoffman v. Inland Wetlands and Watercourses Agency,28 Conn. App. 262, 610 A.2d 185, cert. denied, 223 Conn. 925,614 A.2d 822 (1992). These two cases recognize that inland wetlands agencies may consider other properties owned by the applicant. InRed Hill the plaintiffs appealed a decision of the Glastonbury Conservation Commission which imposed off-site wetlands mitigation as a condition of its approval of an inland wetlands permit for a proposed subdivision, in essence requiring an exchange of one wetlands site for the creation of a new wetlands site elsewhere. Red Hill Coalition, Inc. v. ConservationCommission, supra, 717. The court concluded that the six factors enumerated in General Statutes § 22a-41 (a) and the relevant local regulations were not all inclusive considerations. "[T]he commission's authority to consider factors other than those enumerated in the statutes and regulations is supported by the scope of the wetlands act which `envisages its adaptation to infinitely variable conditions for the effectuation of the purposes of the statutes.' An agency empowered to implement the wetlands act must therefore be vested with a certain amount of discretion in order to carry out its function." (Internal citations omitted.) Id., 722. In Hoffman v. Inland Wetlands andWatercourses Agency, supra, the applicant/property owner appealed partly on the basis that the board heard evidence regarding an adjoining lot owned by the applicant at its hearing. Id., 266. The court held that the commission did not exceed its authority by considering the adjoining parcel at the hearing. "The commission must be allowed to use its own knowledge of a site and local conditions, including other properties owned by the applicant, in its deliberations." Id., 268. It is submitted that while these cases establish that the commissioner did not exceed its authority in looking to other applicant-owned properties, they do not dictate, nor have the plaintiffs demonstrated authority for the proposition that the commissioner must consider, other properties owned by the applicant. The cases highlight that the commission has considerable discretion in deciding what is and is not appropriate to consider.
The question of alternative sites was addressed at the public hearing. Ernest Abate, attorney for the Ferguson Library, testified that the inquiry was not appropriate, "your Board CT Page 14554 certainly is in no position now to second guess the location of this particular facility because the Boards of Education, Finance and Board of Representatives, all elected representatives on those boards, have approved this particular site and have authorized the funding at this particular site. So in terms of whether or not the Library ought to go elsewhere, that determination [has] really already been made by our elected public officials in the city." (Supp. ROR, pp. 119-20.)
B. Finding of Reasonable and Prudent Alternative
 1. Express Finding
The plaintiffs claim that the board did not make a finding of feasible and prudent alternatives. (Appeal, ¶ 12.) "In order to issue a permit, the local inland and wetlands agency must find that `a feasible and prudent alternative does not exist.'" (Internal citations omitted.) Samperi v. Inland Wetlands Agency, supra, 226 Conn. 593. It is submitted that the board made an express finding that a feasible and prudent alternative did not exist. The record contains the findings of the Vice Chairman of the board, Louis Levine: "Mr. Chairman, based on the testimony we have heard . . . further move that since the proposed activities will have no significant adverse impacts to regulated areas, and since there appears to be no prudent and feasible alternatives to the proposed activities, resulting in less impacts to regulated areas, that we approve application 9421 . . . ." (ROR, Item 3, p. 5.)
2. Alternative Configurations Less Detrimental to theEnvironment
The plaintiffs assert in their appeal that the board did not consider any reconfiguration to mitigate the impact of the activity on the wetlands areas, arguing that the applicant did not present evidence to support its finding of a prudent and feasible alternative. The permit allows paving and grading for a parking lot within the setback area, and encroachment on the designated wetlands for construction of a stormwater drainage system. (ROR, Item 2).
"The applicant . . . must demonstrate to the local inland wetlands agency that its proposed development plan, insofar as it intrudes upon the wetlands, is the only alternative that is both feasible and prudent." Samperi v. Inland Wetlands Agency, supra, CT Page 14555226 Conn. 593. Interpreting the phrase "feasible and prudent alternative" the court held that "for a wetlands permit to issue, the local inland wetlands agency must determine that the alternative presented by the applicant is not only sound from an engineering standpoint but is also economically reasonable in light of the social benefits derived from the activity." Id., 595.
The questions of suitability and alternatives were addressed in the findings of the board's Vice Chairman. "[T]hese questions were addressed during the brief discussion at the [public hearing], of plans considered for various drainage schemes and parking lot configurations, as well as the input of zoning and engineering department staff in these regards. Additionally . . . there has been intensive and detailed study of these and other aspects of this project by several city agencies. They have come to the conclusion that having the library built on this site, close to, or adjacent to the Turn of River Middle School, is appropriate, and that does seem to make sense." (ROR, Item 3, p4-5: Findings of Louis Levine, EPB Vice Chairman).
The following excerpts from the public hearing support the Vice Chairman's finding that various alternatives were presented by the applicant and considered by the board: Mr. Pugliese, professional engineer, testified at the hearing in response to a question about discharging the water into an upland area, "I think we have a problem crossing this pipe here because of the elevation crossing . . . . If we did that, we'd have to dig out a channel to get the water out of there. Obviously, we might do more damage to some of the trees that are down there . . . it entered my mind and believe I had a problem crossing this pipe." (Supp. ROR, p. 29: Transcript of the Public Hearing.)
* * *
"Mr. Rohr [board member]: Did you look at a one-way traffic pattern too, so you could pull the parking back a little to the west?
Mr. Pugliese: We looked at that. We also have — which hasn't been brought up, but there is a bookmobile that's going to be needing to get into this facility in this location over there. You need the turning radius and with the width for that, as far as — and we also have kind of a safety issue. Twenty foot aisles are narrow. Twenty-two are more comfortable. One-way is a problem CT Page 14556 because we have no means of getting circulation if we put it one-way in this direction. Somebody would have to pull here and then back out here and then turn in. If this was all full, somebody would have to drive all the way around to get a space over here. It flows better two-way. That was the only — but a minor encroachment we had for the large wetland, we didn't think it was that valuable to shrink this parking lot any." (Supp. ROR, pp. 29-30.)
* * *
"Mr. Rohr: Did you consider on-site storage? Drainage galleys or something like that rather than dumping into wetlands and come back out?
Mr. Pugliese: Well that part, we thought of originally, but the cost was one effect. Burying concrete was expensive compared to what we're doing. Second of all, we have a wetland here that's just dying for water, so we felt that it wasn't — it wasn't an appropriate area to put underground storage. It was thought about in the beginning, but after reviewing and looking at the site, we didn't think it was a proper way to handle the storm water." (Supp. ROR, p. 31.)
* * *
"Mr. Emerson [board executive director]: And then the other question has to do with alternatives. Since this Board has to have a finding that there may not be or there are no prudent or feasible alternatives. I believe it's appropriate to elicit some testimony as to why the Library is the size it is, the size of the parking lot, number of parking spaces, etc.
Mr. Pugliese: I can address that. As Ernie has said, the Library needed the square footage that they had to here to build a library to make up for the library that they're losing at the Turn-of-River Branch. The size of the Library has been determined by the architects and developers early on. The elevation of the Library has to be one story because we have a soil condition underneath it which the foundation cannot substan [sic] more than one story. Also, the — we have a setback requirement of 40 feet from the property line and we are setting that building back 40 feet. They curved this portion of the building to make sure that we were outside of the 25 foot buffer zone. The parking lot . . . We needed a number of spaces to adequately handle the Library's use. And it's really almost an emergency because the Library CT Page 14557 doesn't believe they need that many spaces, but the school will use that parking lot for overflow as well as . . . So the number of parking spaces was worked out based on the meetings with the zoning enforcement officer and the city officials. As far as the additional couple of feet we used for the turning radius for the bookmobile as well as safety for public parking . . . . We did provide quite a big buffer over here and basically it was to take advantage of this little pocket out here in the open space." (Supp. ROR, pp. 50-51.)
* * *
"Mr. Pugliese: We had alternative [sic] were [sic] parking was used in here and this is the setback line. But in reviewing it with these neighbors, it was felt that this was too close to the neighbors and it was brought back away form [sic] it to the plan that we have today. In doing that, we lost — we went from 83 spaces down to the 70 spaces . . . . The initial proposal again had parking within 10 feet or so of this property line and right to the 25 foot setback line. Again, this was all done to keep out of the regulated area . . . . The only encroachment into the wetland itself is to construct this outlet. If we don't construct the outlet, all the benefits that we gain by putting in the drainage, we can't receive any of those benefits because there's a build-up of ground here and we have to get the water out." (Supp. ROR, p. 87-88.)
The record reveals that the record was held open to receive revised site plans depicting modifications to the plans reflecting issues identified during the hearing. (ROR, Item 4: Criteria for Decision and Findings.) Revised plans were submitted. "The latest submitted plan shows that the proposed drainage has been divided into two drainage areas . . . . the driveway and roof water from the building will drain to the north and drain through a grass swale of 100' +/- prior to discharging into the wetlands . . . With the use of this grass swale and the catch basins with sumps and bell traps, it is my belief that no oil separator would be required for this drainage area." (ROR, Item 5: Letter from John E. Pugliesi, P.E. Edward J. Frattaroli, Inc., to David Emerson, Executive Director EPB, dated September 19, 1994.)
Accordingly, the record contains substantial evidence that the board considered alternatives to the proposals in the permit application. CT Page 14558
B. Public Safety and Health
The plaintiff last argues that the board did not consider the character or degree of injury to, or interference with, the public safety and health. (Appeal, ¶ 12.) "Plaintiffs therefore submit that these factors were not properly addressed in passing upon this application despite the concerns raised at the public hearing." (Plaintiff's Memorandum of Law.) The board must consider "the character and degree of injury to, or interference with safety, health, or the reasonable use of property which is caused or threatened." General Statutes §22a-41(a)(5).
The Vice Chairman's findings address and resolve concerns regarding injury to the property, and interference with the safety and health of the area residents. "Several people raised concerns regarding wildlife habitat. True, most of the non wet land portion of the library's portion of the site will be converted to building or parking areas, but there is no evidence of any rare, unique or endangered species there and the significant remaining open areas of the school property, can easily handle the displaced wild life. Additionally, as a result of this project and its activities, the quality of the wet land areas should be improved, thus improving the habitat for wet land species. We should also remember the designated conservation areas that will be achieved as a result of this application. The several areas that have experienced dumping will be cleaned up and continued to be maintained . . . . This board member's concern with this area, that if it were opened up, to access Long Hill Drive, we would in effect have the creation of, if not a thru road, certainly at least an attractive short cut from Vine to the Long Hill Rd. area, and the resultant necessarily more aggressive salting and sanding and additional auto traffic pollutants that would result, could over tax the designated wet land protections and impact the regulated areas. However, the Landscaping Maintenance Agreement, combined with the applicant's statement on the record, that he has no intention of creating that access, allays that concern . . . . Neighbors raised concerns regarding drainage and flooding problems existent in the area. The applicant's professionals have demonstrated, and staff and other city agencies agree, that no additional negative impacts in these areas would occur as a result of the projects activities or end result. In fact, there will be a slight improvement in some areas of concern . . . . Concerns regarding CT Page 14559 the adequacy of protective measures to protect the regulated areas in the Northern portion of the site by the entrance from Vine Road from drainage and runoff impacts, were voiced. I believe these concerns have been satisfactorily addressed by the addition of a drainage channel to filter any pollutants in the runoff from this area." (ROR, Item 3, pp. 2-4).
Accordingly, there is substantial evidence in the record that the board considered the potential injury to public safety and health and relied on changes in the plans and environmental studies to resolve concerns that were raised in the hearings and through letters.
Therefore, the court finds that the record contains substantial evidence to support the board's decision to grant the subject permit.
For the foregoing reasons, the plaintiffs' appeal is dismissed.
KARAZIN, J.