[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
The parties to this appeal are the plaintiff, Steven Levine, and the defendant, Conservation Commission of the Town of Fairfield (Commission).
The plaintiff appeals from a decision of the Commission denying his applications (#93-20 and #93-21[1]) to conduct a regulated activity, the construction of two single family residences, in a wetland area. The Commission serves as the Inland Wetland Agency for the Town of Fairfield and acted pursuant to General Statutes § 22a-42 et. seq. The plaintiff now CT Page 2888 appeals the Commission's decision under General Statutes § 22a-43.
The plaintiff contends that the conclusions of the Commission are based upon staff recommendations and are not supported by substantial evidence in the record. The plaintiff further argues that he is the only one who presented expert testimony, and that the plaintiff's application is the only feasible and prudent use for the property. The Commission responds that, after hearing the evidence presented, it determined, based on substantial evidence, that the proposed use would adversely impact the site, adjacent properties, and downstream properties, and that the plaintiff had not shown that feasible and prudent alternatives did not exist.
The Commission denied the plaintiff's application on May 19, 1994, and sent a notice of denial to the plaintiff, dated May 23, 1994. (Complaint ¶ 4, Answer ¶ 4., (Returns of Record (ROR), Item 70.) Legal notice of the Commission's denial of the plaintiff's application was published on May 27, 1994. (ROR, Item 73.) The plaintiff served the defendant in each appeal by leaving copies of the appeal papers with Juanita Martoni, Clerk of the Commission, and with Victoria Brown, Executive Secretary of the Connecticut Department of Environmental Protection, on June 3, 1994. (Sheriff's Return.) The defendant filed its answers on August 15, 1994, and the returns of record on October 21, 1994. The plaintiff filed his brief on April 17, 1995, and the Commission filed its brief on May 22, 1995.
On December 30, 1993, the plaintiff filed Inland Wetlands and Watercourses Permit Applications, #93-20 and #93-21, with the Commission seeking to build two single family residences on two contiguous building lots on Mayfair Road in Fairfield, Connecticut. (ROR, Items 2 and 3.) The Commission notified the plaintiff, in a letter dated January 11, 1994, of a public hearing to be held on his applications on March 3, 1994. (ROR, Item 8.) Notice of the public hearing was published on February 18 and 22, 1994. (ROR, Item 29.) The March 3, 1994 hearing was cancelled due to inclement weather; (ROR, Item 26); and notice was published on March 24, 1994, that the public hearing was rescheduled to April 7, 1994. (ROR, Item 31.) The hearing was held on April 7, 1994; (ROR, Item 36); which was continued on May 5, 1994; (ROR, Item 50); on May 12, 1994; (ROR, Item 60); and again on May 19, 1994. (ROR, Item 66.) The Commission made its decision denying the plaintiff's applications on May 19, 1994. (ROR, Item 65.) The plaintiff was sent a notice of denial, with CT Page 2889 the reasons stated therein, in a letter dated May 23, 1994. (ROR, Item 70.) Notice of the denial of the plaintiff's applications was published May 27, 1994. (ROR, Item 73.) In its decision the Commission made the following findings of fact: That the site contains over 90% wetlands; that the plaintiff did not provide a current conditions contour map of the site, the surrounding six acre watershed, and existing adjacent homes; that the site acts as a local detention/drainage basin; that the site is located in a highly flood prone watershed; that neighborhood homes currently have basement water problems because of the high groundwater table; that the proposed detention system merely detains increased flow from the site alteration and does not address the displaced water that normally occupies the site, and the plaintiff has not provided data on whether the proposal will raise the groundwater level; that the plaintiff has not addressed how the alteration will affect the flow of water from the surrounding neighborhood; that the site provides urban-type wetlands values, such as a wildlife habitat, low flow recharge, nutrient retention and water quality improvement; that water exiting the site flows through a private drain of unknown condition; and, that the large trees on the site are wetland species. (ROR, Item 70.) The Commission concluded that the proposal will have significant adverse effects on the site, and that the plaintiff has not shown that there are no other feasible alternatives. (ROR, Item 70.)
General Statutes § 22a-43 provides in pertinent part that "any person aggrieved by any regulation, order, decision or action made pursuant to sections 22a-36 to 22a-45, inclusive, by the commissioner, district or municipality or any person owning or occupying land which abuts any portion of land or is within a radius of ninety feet of the wetland or watercourse involved in any regulation, order, decision or action made pursuant to said sections may, within the time specified in subsection (b) of section 8-8 from the publication of such regulation, order, decision or action, appeal to the superior court. . . ." Section8-8 (b) provides that an appeal must be commenced by service of process within fifteen days from the date that notice of the decision was published. General Statutes § 8-8 (b). Should the plaintiff provide evidence at the hearing that he is the owner of the property, or should the parties stipulate to the fact that the plaintiff is the owner of the property that is the subject of the Commission's decision, the plaintiff is aggrieved pursuant to § 22a-43. Furthermore, notice of the Commission's decision was published on May 27, 1994; (ROR, Item 73); and service was made CT Page 2890 on June 3, 1994. (Sheriff's Returns) Therefore, the plaintiff's appeals were timely filed.
"In challenging an administrative agency action, the plaintiff has the burden of proof. . . . The plaintiff must do more than simply show that another decision maker such as the trial court, might have reached a different conclusion. Rather than asking the reviewing court to retry the case de novo . . . the plaintiff must establish that substantial evidence does not exist in the record as a whole to support the agency's decision. . . . In reviewing an inland wetlands agency decision made pursuant to the act, the reviewing court must sustain the agency's determination if an examination of the record discloses evidence that supports any one of the reasons given. . . . The evidence, however, to support any such reason must be substantial; [t]he credibility of witnesses and the determination of factual issues are matters within the province of the administrative agency. . . . This so-called substantial evidence rule is similar to the sufficiency of the evidence standard applied in judicial review of jury verdicts, and evidence is sufficient to sustain an agency finding if it affords a substantial basis of fact from which the fact in issue can be reasonably inferred. . . . [I]t imposes an important limitation on the power of the courts to overturn a decision of an administrative agency . . . and to provide a more restrictive standard of review than standards embodying review of weight of the evidence or clearly erroneous action. . . . The United States Supreme Court, in defining substantial evidence in the directed verdict formulation, has said that it is something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence. . . . The reviewing court must take into account [that there is] contradictory evidence in the record . . . but the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence. . . ." (Citations omitted; internal quotation marks omitted.) Samperi v. Inland Wetlands Agency, 226 Conn. 579,587-88, 628 A.2d 1286 (1993).
The plaintiff contends that the pertinent facts, #'s 6-10, upon which the Commission based its decision are not supported by substantial evidence, that the plaintiff was the only party to put expert testimony on the record, and that the alternatives CT Page 2891 noted by the Commission are not feasible. The findings of fact that the plaintiff contests are that the site is located in a highly flood prone watershed; that neighborhood homes currently experience water problems because of the naturally high water table; that the proposed storm water detention system only detains increased flow from the site alteration and does not address the displacement of water normally occupying the site or whether it would raise the groundwater table; that the plaintiff has not addressed the effects upon the existing hydrogeological conditions; and that the site provides beneficial urban wetlands values, such as a wildlife habitat, low flow recharge, nutrient retention and water quality improvement. The Commission argues that pursuant to General Statutes § 22a-41, it is prohibited from issuing a permit to conduct a regulated activity on wetlands unless no reasonable and prudent alternative exists, that the plaintiff did not show that no reasonable or prudent alternative existed, and that substantial evidence for the decision appears in the record.
General Statutes § 22a-41 provides: "(a) In carrying out the purposes and policies of sections 22a-36 to 22a-45, inclusive, including matters relating to regulating, licensing and enforcing of the provisions thereof, the commissioner shall take into consideration all relevant facts and circumstances, including but not limited to: (1) The environmental impact of the proposed action; (2) The alternatives to the proposed action; (3) The relationship between short-term uses of the environment and the maintenance and enhancement of long-term productivity; (4) Irreversible and irretrievable commitments of resources which would be involved in the proposed activity; (5) The character and degree of injury to, or interference with, safety health or the reasonable use of the property which is caused or threatened; and (6) The suitability or unsuitability of such activity to the area for which it is proposed. (b) In the case of an application which received a public hearing, a permit shall not be issued unless the commissioner finds that a reasonable and prudent alternative does not exist. In making his finding the commissioner shall consider the facts and circumstances set forth in subsection (a). The finding and reasons therefor shall be stated on the record."
The first finding of fact challenged by the plaintiff is #6 of the Commission's decision which states that "[t]he site is located at the headwaters of the Grassmere Brook-Turney Creek watershed which is a highly floodprone watershed." The plaintiff maintains that its expert asked for a clarification of this CT Page 2892 finding because a portion of the flooding is caused by coastal conditions, therefore the brook has little effect on the flooding, and stated that the removed storage will have no significant impact. (ROR, Item 50. p. 9.)
The Conservation Administrator, Annette Jacobson, in her recommendations regarding the plaintiff's applications stated that "[t]he wetland area on-site, as part of the larger wetland area is a natural depression and water storage area. This natural condition performs the very important function of storm water detention. In this location, i.e., in the upper part of the watershed, water storage is especially valuable because it provides flood protection not only to abutting properties, but to many properties downstream. The lower portion of this Grassmere Brook/Turney Creek watershed is known to be highly floodprone based on Federal Emergency Management Agency (FEMA) Flood Insurance Study August 1986, state DOT project 50-92 for major flood control modifications), my experience in observing town drainage conditions over the past 10 . . . years and this department's observations since 1971." (ROR, Item 23, p. 4.) Jacobson also wrote to the Commission in a letter dated May 10, 1994, in which she stated that "[t]he increase in rate of flow off-site and depth of water (our Town Engineering Department puts the water level increase at about three inches) is not insignificant in my opinion. These increases are proposed within a watershed and neighborhood already known to be floodprone. Any increase in runoff to such floodprone areas is a concern especially when considering the cumulative impacts of similar proposals. The Town is so concerned about flooding in this Grasmere Brook watershed that the Town proposed constructing a storm water detention basin at Jennings School at its own expense to reduce downstream flooding. . . . Opportunities for reducing storm water runoff and lessening flooding in this watershed are extremely rare given that the watershed is highly developed. Any loss of existing flood storage is unreasonable given the level of existing flooding and the Town pursuit of additional flood storage areas." (ROR, Item 54.) The Commission also relies on DOT project 50-92, regarding construction proposed by the Town of Fairfield in 1973 to control flooding in the Turney Creek area. (ROR, Item 1.) However, the record does not reflect whether this construction was ever carried out, or what effects it had regarding flooding in the area of the site now at issue.
The plaintiff's expert, Richard Regan, stated that he "looked at the flood study for the Town of Fairfield, [and] quite a bit CT Page 2893 of the flooding is down in the coastal areas. Anything that we do on our site has no impact with the riverine, with the coastal flooding. That's obviously a concern of the coastal study. I just wanted to, hopefully, to have the staff qualify that statement. From my engineering study[,] I studied this site, the flows leaving from this site, we're not going to have, we'll have no impact on flooding all the way down through the watershed. Our site is only a tenth of a percent of this whole, of the Grassmere watershed at Glenarden Drive, and its only 4 ten-thousand[ths] down at Kings Highway Cutoff. So to suggest that we're going to have impact on flooding downstream is, I think, inappropriate." (ROR, Item 50, p. 9.)
The plaintiff contends that there was no evidence in the record to contradict his expert's testimony. Nevertheless, "`an administrative agency is not required to believe any witness, even an expert, nor is it required to use in any particular fashion any of the materials presented to it so long as the conduct of the hearing is fundamentally fair.'" Samperi v. InlandWetlands Agency, supra, 226 Conn. 597. "[A] lay commission acts without substantial evidence, and arbitrarily, when it relies on its own knowledge and experience concerning technically complex issues such as pollution control, in disregard of contrary expert testimony, without affording a timely opportunity for rebuttal of its point of view." (Internal quotation marks omitted.) CentralBank for Savings v. Planning Zoning Commission,13 Conn. App. 448, 456, 537 A.2d 510 (1988). In the present case the Commission relied on the recommendations of its staff and the town conservation commissioner. "[T]here is a presumption that public officials acting officially properly performed their duties. . . . This encompasses the presumption that the public official is qualified in the field wherein his or her official duties lie until the contrary is shown." (Citation omitted; internal quotation marks omitted.) Manatuck Associates v.Conservation Commission, 28 Conn. App. 780, 793, 614 A.2d 449
(1992). The Commission is entitled to treat the opinions of the staff and conservation commissioner as expert opinion, and the statements and recommendations of the staff and conservation commission provide substantial evidence that the site is located in a highly floodprone watershed.
The plaintiff also maintains that the Commission did not have substantial evidence for finding of fact #7 in which the Commission stated that "[n]eighborhood homes currently experience basement water problems due to the naturally high groundwater CT Page 2894 table. (ROR, Item 70, p. 6.) The plaintiff argues that there was no evidence as to the cause of the water problem, and that the groundwater level is not naturally high but is a result of the prior filling of neighboring lots.
The plaintiff's expert stated that "[t]here was a concern about ground water flow. The house that does have a basement within the proximity, there's a couple, actually, going up to the east, there was a concern that with filling of our site, and there was a suggestion maybe we should bring a ground water geologist in and study what the impacts are of this fill. Wellwhen you put fill in it tends to be a poor conveyer of wateranyway. Soil in its natural state is a lot better for carrying water, but what we could do, and I think it would be a simple, practical solution, is put a curtain drain along our property. Therefore, it would intercept any water and its function would be similar to the state that it is now and prevent any impacts from our filling. So a simple solution, instead of getting involved with ground water study, ground water hydrologist, etc., geologic hydrologist, would be to put a curtain drain along our easterly boundary that would pick up any ground water and discharge it at the current elevation of the wetland that we're not going to disturb, and therefore, we would have no impact on the basements if there is flooding or water in the basement of the adjoiner. But there is a basement in the adjoiner to the east." (Emphasis added.) (ROR, Item 50, p. 10.) The conservation administrator stated that she believes that "increasing the rate of flow from the site will exacerbate the flooding conditions of surrounding property of downstream properties. . . . Mr. Regan mentioned adding a reducer on the 12-inch culvert that goes under the Mascia property if he had consent. Well, putting a reducer on that 12-inch pipe would also back water up on more of the other surrounding properties. . . . [H]e's proposing to raise the water level, I believe he indicated about two inches or just slightly less than two inches. Well, when I look at raising a water level, that's increase in flooding in my opinion. When you raise the water level, you just don't raise it at one point. You raise it on the whole water surface, and every where that wetland goes on all the other properties that would be raised." (ROR, Item 50, pp. 15-16.) Tom Steinke, the conservation director noted that by not losing volume at the headwaters wetlands or increasing the rate of discharge, flood relief is enhanced downstream. (ROR, Item 50, p. 14.) The engineering department of the Town of Fairfield calculated that the surface water stage level would increase to three inches, which would have a minimal impact on CT Page 2895 the two year storm stage, but for the ten year storm stage would encroach on the neighboring properties a few inches deep. (ROR, Item 53.) Moreover, three neighboring property owners expressed that they had existing flooding problems which they felt would be exacerbated if the wetlands were reduced in size. (ROR, Items, 30, 34, 48.) There was substantial evidence on the record for the Commission to conclude that neighborhood homes experience water problems due to a naturally high ground water table. The plaintiff contends that the groundwater level is not "natural" because of the changes that have occurred on neighboring properties, however, the plaintiff's application concerns the property as it exists now, not as it may have existed sometime in the past.
The plaintiff also challenges finding of fact #8 in which the Commission found that "[t]he proposed stormwater detention system is merely designed to detain increased flows generated from the site alteration, and ignores the broader implications of displacing water which would normally occupy the site. The applicant has not provided data on whether the proposal will result in raising the groundwater table." (ROR, Item 70, p. 6.)
The plaintiff relies on the General Environmental Assessment submitted by his expert which states in subsection (c) regarding groundwater infiltration and exfiltration that "[a]s much of the lots are wetland, the wetland functions as a `discharge zone' for groundwater during much of the year. . . . Post development, the lots will have inherently more infiltration function as a result of infiltration galleries being installed." (ROR, Item 3.) However, the expert's report goes on to state in subsection (d) that "[t]he storage volume provided in the infiltration galleriespartially compensates for lost flooding storage volume. (Emphasis added.) (ROR, Item 3.) Moreover, the plaintiff's expert acknowledged that the decrease in water storage on the site would impact the property adjoining to the west, although that property does not have a basement; (ROR, Item 50, p. 11.); and spoke of plans to move water off the property; (ROR, Item 50, p. 12); but did not address whether the groundwater level would be raised, or what effect the displaced water would have even if it is drained off of the property. Therefore, the Commission had substantial evidence for finding of fact #8.
The Commission stated in finding of fact #9 that "[t]he applicant has not addressed the anticipated effects upon existing hydrologic conditions. The applicant has not identified the CT Page 2896 amount, flow direction and rates of groundwater flow through the site from the surrounding neighborhood, and the effects that the placement of 550 cubic yards of fill and a foundation have on the rates at which groundwater flows through the area. This would normally involve the determination of the hydraulic gradient, permeability of surrounding soils, source and amount of water. It appears that such significant filling and alteration would reduce the rate at which water can leave the surrounding properties, and that the permeability of the fill material would directly change the flow characteristic as well."
The plaintiff contends that his expert addressed these issues in a memorandum dated May 3, 1994, and in Addendum #2. In his memorandum the plaintiff's expert states that a curtain drain could be installed to ensure that groundwater continues to flow to the remaining portion of the wetlands. (ROR, Item 51, Exhibit B.) The expert also notes that the properties to the north, east and west were created by filling which may have impacted groundwater flow. Id. Nevertheless, the filling of other properties is immaterial as those are the existing conditions concerning this application, and do not reduce the burden on the plaintiff. Furthermore, in his addendum #2, the expert acknowledged that his calculation as to the water surface rise was incorrect in that it would not be 2 inches but 5 1/2 inches. (ROR, Item 67, Item 66, p. 3.) The expert also stated that "the impact is insignificant because primarily this affects the applicant's property and not the adjoiners." (Emphasis added.) (ROR, Item 67.) The plaintiff's expert further stated "it's hard to sort of say that there will be an immediate impact with filling on our site with those houses that are quite a bit higher in elevation. Again, the soil that's been placed all around our site, too, is a disturbed fill, and that doesn't really allow the percolation of water very quickly. Soil in its natural state passes water a lot better than when it's being handled and placed. Then it becomes just very impermeable, so to speak. . . ." (ROR, Item 60, pp. 27-28.) These statements are substantial evidence upon which the Commission based its findings of fact regarding the permeability of the soil and the uncertainty of the effect of surrounding property owners.
Lastly, the plaintiff argues that the Commission did not have substantial evidence for finding of fact #10, which states that "[t]he wetland on-site provides beneficial urban-type wetland values and provides wildlife habitat, low flow recharge, nutrient retention and water quality improvement which are significant and CT Page 2897 important in developed areas." The plaintiff maintains that his soil scientist was of the opinion that the wetland had low environmental values. (ROR, Items 3, 53, Exhibit E.) However, the staff recommendation determined that, although the site is an urban wetland it "provides greater biodiversity and productivity than upland environments. Ducks are known to utilize this area when it floods in the spring and fall, songbirds use it regularly for cover, food and nesting, and the site is appropriate for reptile and amphibian use. Other small mammals such as rabbit, bats, raccoon, skunk, opossums, mice and squirrels, etc. would be expected to utilize the site. By virtue of its tight, fine grained soils, a typical hardpan substrate and its basin aspects the site provides for low-flow recharge of downstream wetlands and watercourses during low flow periods. . . . The wetland also functions for nutrient retention. . . . The wetland tends to hold the nutrients (usually nitrogen and phosphorus) from the runoff in its sediments and leaf litter and thereby create a sink or storage area for theses nutrients. . . . The presence of the wetland leaf litter, sediments and plants also provides for biofiltration, i.e., water quality improvement of urban runoff. Wetlands are sediment traps, and provide anaerobic and aerobic processes such as denitrification and chemical precipitation to remove certain chemicals from the water. . . ." (ROR, Item 23, pp. 3-4.) Moreover, neighboring property owners testified, and sent letters regarding the biodiversity of the wetlands. (ROR, Item 60, pp. 14-18, 22, Item 48, Item 34, Item 30.) Accordingly, the Commission had substantial evidence upon which to base finding of fact #10.
Finally, the plaintiff argues that the alternatives presented by the Commission are not feasible or prudent.
In its denial of the plaintiff's applications the Commission proposed a number of alternatives, such as the development of other upland properties with less impact on wetlands, to construct a house on piers, minimal house construction with the minimum setback, minimum square footage and virtually no yard, and utilization of the site in its natural state. (ROR, Item 70, p. 8.) The plaintiff argues that none of the alternatives proposed by the Commission are feasible. Nevertheless, the burden of proof concerning feasible and prudent alternatives does not lie with the Commission, but with the plaintiff. Hoffman v.Inland Wetlands Commission, 28 Conn. App. 262, 265, 610 A.2d 185, cert. denied, 223 Conn. 925, 614 A.2d 822 (1992). "The applicant, accordingly, must demonstrate to the local inland wetlands agency CT Page 2898 that its proposed development plan, insofar as it intrudes on the wetlands, is the only alternative that is both feasible and prudent." Samperi v. Inland Wetlands Agency, supra,226 Conn. 593. "[F]or an inland wetlands permit to issue, the local inland wetlands agency must determine that the alternative presented by the applicant is not only sound from an engineering standpoint but is also economically reasonable in light of the social benefits derived from the activity." Samperi v. Inland WetlandsAgency, supra, 226 Conn. 595.
The plaintiff proposed a plan for the development of the site to the Commission, and an alternate plan which required a lesser disturbance of the wetlands. (ROR, Item 2.) In regard to the proposals, Jacobson stated "[i]t's my opinion that both of those ideas would have significant and adverse effects on the wetland on-site, on the adjacent properties that have the wetland regulated area and flooding concerns, and downstream flooding concerns." (ROR, Item 50, p. 19.) Janovsky, a Commission member replied "you're not saying that it's totally beyond the realm of possibility that these could be developed in such a manner as to mitigate that effect?" Id. Jacobson answered that "[i]t's not beyond the realm of possibility. I'm not the most creative person in the world. I can't think of all the alternatives." (ROR, Item 50, p. 20.) Furthermore, Steinke stated that to develop this site a "whiz-bang" plan was needed and that was "going to be something a lot more tha[n] what you've seen this evening. . . ." (ROR, Item 50, p. 27.) The rejection of the plaintiff's applications "does not imply that less ambitious plans will receive a denial as well." Hoffman v. Inland Wetlands Commission, supra,28 Conn. App. 269. The Commission had substantial evidence to determine that the plaintiff's proposals were not sound from an engineering standpoint, and that other alternatives exist.
For the foregoing reasons, the plaintiff's appeals are dismissed.
EDDIE RODRIGUEZ, JR., JUDGE