[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
 I
This is an appeal taken from a decision by the defendant, Branford Inland Wetlands Commission ("the Commission") granting, with conditions, a permit to the defendant Stop Shop Supermarket Company ("Stop Shop") to conduct regulated activities on land known as 1151, 1201 and 1219 West Main Street in the Town of Branford.
Stop Shop filed its application on or about September 27, 1996. On November 2, 1996, the Commission conducted a site inspection of the subject property. The Commission subsequently made a finding of "significant activity," as defined in Section 2.1cc. of The Inland Wetlands and Watercourses Regulations of the Town of Branford ("Regulations") and scheduled a public hearing pursuant to Regulations, Section 9.1. The application was received by the Commission at its regular meeting on November 14, 1996. A public hearing on the application opened on December 12, 1996, continued on January 9, 1997 and was concluded on February 13, 1997. The Commission met on March 13, 1997 and after deliberations approved the application with nine conditions. The plaintiffs, Branhaven Plaza, LLC and the Great Atlantic Pacific Tea Company, Inc./Waldbaum's, Inc. ("Branhaven") intervened in the proceeding at the time of hearing, pursuant to General Statutes, Section 22a-19, participated in said hearing, submitted exhibits, and following approval, filed this appeal. The plaintiff's standing to bring this appeal was challenged by defendants by means of a motion to dismiss on the grounds that plaintiffs, in intervening, had failed to file a valid verified pleading with the Commission CT Page 8090 pursuant to General Statutes, Section 22a-19. This court, after hearing, denied said motion on November 24, 1997 and defendants have preserved their appellate rights on this issue.
A hearing on this appeal was held on March 3, 1998. Following said hearing, by letter dated March 6 and received by the court on March 13, 1998, counsel for the plaintiff requested this court to refrain from deciding the matter until an issue (regarding soil composition of the site) had been resolved. Subsequently, plaintiffs filed a motion directed at resolving the said issue ("Motion for Leave to File Post-Trial Brief, or in the Alternative, for Additional Argument"). A hearing on said motion has held on April 16, 1998, in the course of which the parties resolved the issue and the court, accordingly, denied the relief requested.
 II
The subject application was made in furtherance of Stop Shop's plan to build a supermarket and adjacent packing on the site. The proposed supermarket would comprise some 77,443 square feet and the plan calls for the construction of some 369, 000 square feet of impervious surface, encompassing the building and adjacent parking and receiving areas.
The parcel of land comprises approximately 10.7 acres and is located in the southwest part of Branford, near the East Haven town line. The topography of the site is uneven, with the northeastern and central portions at a higher elevation than the northwestern and southeastern portions. A bedrock ridge separates the central from the southeastern portions. The topography has been disturbed by past use for quarrying operations. The parcel is bounded to the west and northwest by West Main Street, to the south by an Amtrak rail line and to the north and east by residential properties. There are two commercial buildings located in the northwestern section of the site, as well as a large paved parking area. Under the plan, these buildings are slated for demolition. Scattered bulky waste is strewn throughout the central upland area and in the wetlands designated as 1, 2 and 3.
There are three wetlands and one watercourse currently on the property. While their precise dimensions are disputed, they cover a total of some 2.18 to 2.70 acres.
 The applicant's expert initially calculated that Wetland CT Page 8091 1 covers approximately 0.21 acres and is located in the central portion of the property. It is located in a topographical depression among mounds of fill and exposed bedrock. Plaintiff's expert estimated this wetland to be approximately 0.33 acres larger.
 Wetland 2, located south of Wetland 1, and separated from 1 by discarded asphalt piles, covers approximately 0.026 acres or 1148 square feet, as initially computed. Plaintiff's expert estimated this wetland to be approximately 0.04 acres larger.
 Wetland 3 is approximately one half (0.50) acre in size. It is located in the southeastern section of the site and is described as a wet meadow community, with shrubs and trees primarily located around its edge. It is located in an excavated soil area and is in the close proximity to houses and the rail line to the south.
 Wetland 4 is the watercourse, ditched and located in the southwestern portion of the site. It comprises some 0.11 acres and consists of a sparsely vegetated channel entering the property from the west and proceeding through the site in a southeasternly direction. It discharges from the property under the Amtrak tracks through a concrete box culvert and a 54 inch reinforced concrete pipe tot he south and into a large wetland.
The functional quality of all four wetlands is deemed low by applicant. Stop Shop's plan calls for the elimination of Wetlands 1 and 2. Stop Shop initially proposed to create a new wetland, roughly the size of Wetlands 1 and 2 combined, to be located to the west and southwest of the existing Wetland 3. Subsequently, the applicant modified its proposal, replacing the new wetland with an infiltration basin. Stop Shop contends that following the completion of its project there will be less runoff and enhanced removal of pollutants from runoff than is currently the case.
 III
The plaintiffs intervened in the subject administrative proceeding pursuant to General Statutes Section 22a-19(a) under which "any person" may intervene as a party on filing a verified pleading asserting that the proceeding or action for judicial review "involves conduct which has, or which is reasonably likely CT Page 8092 to have, the effect of unreasonably polluting, impairing or destroying the public trust in the air, water or other natural resources of the state." Such intervention is for limited purposes. Our Supreme Court has held that such intervention confers standing only to raise environmental issues, and then, only such environmental issues as come within the jurisdiction of the agency concerned, Gardiner v. Conservation Commission,222 Conn. 98, 107.
Relying on this limited scope of intervention defendants Stop Shop and Commission assert that of 13 claims raised by the plaintiffs' in their Appeal (Appeal, paragraphs 11(a) through (m)) 5 were not briefed and should be deemed abandoned; the remaining 8 claims, defendants contend, are "primarily procedural" and as such are not properly before this court. The court declines to embrace such a stifling interpretation of an intervener's limitation under Section 22a-19. An intervener acquires rights of due process, and denial, by a commission of notice and opportunity to be heard would undoubtedly be appealable. Accordingly, the court must review the plaintiffs' claim to determine, in the first instance, if a claim is "purely" procedural, divorced from any environmental issue of substance properly before the Commission.
 IV
Plaintiffs made the following allegations:
 The Commission changed certain wetland boundaries on its published map without following the statutorily mandated procedures.
 With regard to Condition 9 of the approval, the Commission impermissibly delegated its decision-making authority of the Town Engineer.
 The receipt and use of data, pursuant to Condition 9, violated the due process rights of the intervenor and the public.
 The Commission acted arbitrarily in accepting the applicant's proposal to construct an infiltration basin, as such a proposal was not supported by substantial evidence in the record.
 With regard to Condition 6, the Commission exceeded its authority in accepting money and in-kind services as CT Page 8093 mitigation.
 In evaluating the site's wetlands, the applicant and the Commission misused DEP Bulletin No. 9, and the Commission thus followed no scientific guidance in its evaluation.
 The applicant failed to show the absence of feasible and prudent alternatives to its proposed project.
 Wetlands mapping
The plaintiff alleges that the Commission changed certain wetland boundaries on its published man without following the statutorily mandated procedures.
In its application, Stop Shop, as required by Regulations, Section 7.4(d), described the wetlands to be affected, computed their acreage and delineated them on a map, based on the report of its soil scientist. The plaintiffs' expert subsequently inspected the site, made his own delineation and computation which indicated there were more wetlands and that the wetlands on site covered a larger area than claimed by Stop Shop's expert. In the course of the public hearing, the experts' conflicting findings were aired, and the parties could not reach agreement on the proper delineation of the wetlands. Stop Shop then engaged a third expert, Mr. Klein, who inspected the site on or about January 21, 1997 and delineated the wetlands (ROR 65, Map WP-1), which delineation was submitted to the Commission. As the February 13, 1997 session of the public hearing, the experts, including Klein, again addressed the issue; while intervener's expert acknowledged Klein's delineation was an improvement on the original submission, me parties maintained differences on the issue. On motion the Commission then voted to accept Klein's map as delineating the subject wetlands.
Plaintiffs argue that the Commission's action was illegal in that it constituted a boundary change, and was done without compliance with the requirements of General, Statutes, Section 22a-42a(b), the statute governing establishment of boundaries by regulation. The court agrees with the Commissioner of Environmental Protection that this claim is beyond the scope of permissible intervention under Section 22a-19. Even were we to concede that this claim falls within that scope, the claim is without merit. As stated in Regulations, Section 3, titled "Inventor, of Regulated CT Page 8094 Areas", the map of regulated areas, established and amended pursuant to General, Statutes Section 22a-42a(b), delineates the general
location and boundaries of inland wetlands . . . (emphasis added). In contrast, an applicant for a permit to conduct regulated activities under General Statutes, Section 22a-42a(d) is expected to delineate and compute the actual and current extent of wetlands to be affected. There is no requirement, stated or implied, that a commission, having determined that the actual boundaries of a wetland, delineated in the course of a proceeding to conduct regulated activities, must interrupt the permit process to call a hearing to amend the town map. We must be careful not to bog local agencies down in a morass of technical requirements which serve no useful purpose. SeeSamperi v. Inland Wetlands Agency, supra at 596.
The court finds that plaintiffs have failed to establish, by a fair preponderance of the evidence, that the commission changed the boundaries of several wetlands without following either the procedures established in its own regulations or the procedures required by statute.
 Condition 9 — storm drainage calculations
Condition 9 of the Commission's approval reads: "The Town Engineer of Branford, Ct. must review, verify and agree with the engineering data submitted by the applicant's engineer, regarding no net increase in peak flow for 25, 50 and 100 year storm events."
The plaintiff's claims regarding this condition are two: first, this constitutes an unlawful delegation to the Town Engineer of the Commission's authority; second, receipt by the Commission of this information, following the close of the public hearing, and, indeed, after the issuance of the Commission's approval of said application, was a denial of due process to the intervenor and to the public, depriving them the right to examine the evidence in advance, to examine or cross-examine applicant's experts and to present countervailing testimony.
Condition 9 reflected what was a serious concern of members of the public and members of the Commission: the potential downstream effects of water runoff from the completed project (ROR 47). A concern was that current and anticipated problems with runoff in the watershed might be exacerbated by completion of the instant project. The intervener estimated an increase of runoff from the project site as high as 49% (ROR 47, p. 88). The applicant asserted that the proposal as amended, CT Page 8095 would, if implemented, result much as a 29% net decrease in runoff from the project site (ROR 47, p. 109). By memo dated February 13, 1997, the Town Engineer recommended to the Commission that certain items "should be confirmed by the applicant's engineer for the record on this application" (ROR 37). These "items" included:
 a. It should be verified that the cumulative 25 year design storm drainage flow impact of this project on the drainage structures under the railroad right of way is less than the current or post WalMart improvements condition.
 b. The flows entering the creek due to connections from the site do not exceed the flows entering the creek under current conditions and are proposed to be mitigated from me current condition.
 c. The impact of the 100 year storm should be provided as above.
At the hearing session February 13, 1997, Mr. Baker, the intervenor's engineer, analyzed and criticized the subject application as modified on January 29, 1997, with particular reference to the issue of downstream flooding. (ROR, pp. 66-77) Baker's analysis was detailed and extensive. At its conclusion, he answered a Commissioner's question and submitted his written review of the application as modified on January 29th (ROR 45). At that point, the court concludes, based on its review of the record, there was substantial evidence in the record such as to permit the Commission to find the applicant's measures to deal with runoff adequate to meet the criteria needed for permit approval.
Later in the February 13th session, applicant's engineer, Mr. Marsiglio, testified in rebuttal. In the course of his testimony, over the objection of intervenor's counsel, he testified with regard to the "items", supra, listed by the Town Engineer. Counsel for the intervenors was given an opportunity for rebuttal but chose simply to renew his objection. Because of its concern over the "15 day rule", (Regulations, Section 8.7) the Commission declined to accept applicant's written report in support of its engineer's testimony. Subsequently, after deliberations, the Commission issued its permit approval with Condition 9.
It is undisputed that the defendant Commission is entitled to professional technical assistance in carrying out its responsibilities,Gardner v. Conservation Commission, 222 Conn. 98, 107;Frito-Lay, Inc. v. Planning and Zoning Commission, 206 Conn. 554, CT Page 8096 571 (citations omitted); Regulations, Section 10.4. The information requested by the Commission was within the scope of the plans presented at the public hearing, Hawkes v. Town Plan Zoning Commission,156 Conn. 207, 212. In directing Mr. Dugley, the Town Engineer, to "review, verify and agree with" the engineering data submitted by the applicant in support of its February 13th, testimony, the Commission was relying on Dugley to perform the quintessential staff function; namely to use his expertise in analyzing technical data to determine if it corroborated applicant's testimony, and to report back to the Commission the results of his analysis. This is precisely the role the Town Engineer would play if called on to review data submitted by any applicant at any stage of the proceedings. On receipt of the Town Engineer's report, the Commission would decide what action to take, up to and including revocation, seeGardner v. Conservation Commission, supra, at 104; Regulations, Section 11.11. There is no impermissible delegation of authority.
Plaintiffs' due process argument also must fail. The issue of site runoff storm drainage and downstream consequences were addressed extensively in the course of the proceedings. Plaintiffs participated vigorously throughout, testifying on these issues, submitting critiques and reports on these issues. The applicant made numerous and significant changes to its plans in response to the concerns raised by the plaintiffs. The data in question was corroborative, was not required by the Regulations, and standing alone, could not form the basis of a permit approval. The only requirement (in administrative proceedings) is that the conduct of the hearing shall not violate the fundamentals of natural justice, Grimesv. Conservation Commission, 243 Conn. 266, 273 (citation omitted). Fundamentals of natural justice require that there must be due notice of the hearing and at the hearing no one may be deprived of the right to produce relevant evidence or to cross-examine witnesses. Id. at 274 (citations omitted). In the instant case, the Commissioners based their decision on the evidence in the record, and as an added precaution, required corroborative data, as a condition of approval. "We conclude that [plaintiff's] rights were not violated merely by the attachment to a permit of conditions that required the submission of further information after the agency's decision had been rendered", Gardner v.Conservation Commission, supra at 108.
The court finds that plaintiffs have failed to establish, by a fair preponderance of the evidence, that the Commission unlawfully delegated its authority to the town Engineer, and failed to establish, by a fair preponderance of the evidence, that plaintiffs were denied due process by the Commission's receipt of data after the close of the public hearing on the instant application. CT Page 8097
 The Infiltration Basin
Applicant's original proposal called for creation of a wetland in the southwestern section of the site, to the west and southwest of Wetland 3. In the course of the proceedings, applicant modified its plan, proposing to construct a detention, better described as an infiltration, basin, albeit with some wetland features, in the southwest corner. This proposal was developed to meet concerns regarding downstream flood control expressed by intervenor and members of the public.
Plaintiffs claim that the Commission acted arbitrarily in approving the applicant's proposal to construct this infiltration basin, in that such a proposal was not supported by substantial evidence in the record.
Courts are not to substitute their judgment for that of the [commission]. . . and decisions of the [commission] will not be disturbed as long as honest judgment has been reasonably and fairly exercised after a full hearing, Torsiello v. Zoning Board of Appeals,3 Conn. App. 47, 49. The Commission is vested with a large measure of discretion and the burden of showing the agency has acted improperly rests upon the one who asserts it, Mario v. Fairfield, 217 Conn. 164, 169. The court must sustain the Commission's determination if there is substantial evidence in the record to support such determination,Samperi v. Inland Wetlands Agency, 226 Conn. 579, 587-88. Evidence is sufficient to sustain an agency finding if it affords a substantial basis of fact from which the fact in issue can be reasonably inferred, id. at 588. Substantial evidence is something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence, id. (citation omitted).
A review of the record discloses substantial evidence to support the Commission's (implicit) finding that the proposed infiltration basin was adequate for the purpose for which it was designed (See ROR 47, p. 114, Stevens testimony; pp. 108-111; 117-119 and 126, Marsiglio testimony; ROR 65,) See also intervenors' testimony and reports on the issue, which the Commission is free to utilize, in whole or in part, as it sees fit.
The court finds that the plaintiffs have failed to establish, by clear and convincing evidence, that the Commission acted arbitrarily in approving applicant's proposal to build an infiltration basin, in that the proposal was not supported by substantial evidence in the record.
CT Page 8098
 Condition No. 6
Condition No. 6 of the application reads: "`Banking mitigation' offered by the applicant to be accepted by the commission for future mitigation, restoration, improvement, and or study in the same watershed. This amount to be not less than $25,000 plus a like amount of in kind professional/engineering services to be provided for the above mentioned purposes during the next four or five years. This funding and gift of services is to be used at the discretion of the Inland Wetlands Commission only."
Plaintiffs contend that in accepting such "mitigation" the Commission exceeded its authority. Plaintiffs characterize this as paying cash for the destruction of wetlands and urge that it be declared absolutely invalid and contrary to law. The very statement of the claim should alert the Commission to the pitfalls of embarking on a course of requiring or encouraging cash contributions as a condition of issuance of permits. Such a practice would give rise to perceived and, conceivably, real abuse and would be contrary to public policy. However, in the context of this application, the circumstances from which the applicant's offer of money and in-kind services arose, and the purposes to which these payments are to be applied, the court believes plaintiff mischaracterizes both applicant's offer and the condition imposed by the Commission. Nor has plaintiff cited statutes or case law barring the imposition of such a condition by the Commission.
In the course of the public hearing, citing concerns with the watershed, of which the subject wetlands form a part, the Commission Chairman queried applicant's counsel with regard to applicant's willingness to add efforts for off-site mitigation to the proposed on site mitigation. The applicant's counsel in response offered $25,000 and a like amount of consultant services for off-site projects in the same watershed. (ROR 47, pp. 130-135). As plaintiff acknowledges,Red Hill Coalition v. Conservation Commission, 212 Conn. 710, holds that offsite compensation for the loss of wetlands is not barred by statute or regulations "so long as the commission has considered the impact of the application on the subject property in accord with the policies outlined in Ss. 22a-36 through 22a-45 of the General Statutes and the local regulations" Id. at 722-23. It should be noted that in the instant case applicant is to create a wetland cum infiltration basin on-site, of a size comparable to the Wetlands 1 and 2, slated to be eliminated. The court perceives no moral distinction between the Red Hill condition, requiring a compensatory excavation of a pond at a site to be chosen by the Commission and the payment of a fixed amount of money and in-kind services for CT Page 8099 off-site mitigation. Plaintiff has failed to establish, by a fair preponderance of the evidence, that the Commission, in imposing Condition No. 6 as a condition for approval of the subject application, exceeded its authority.
 DEP Bulletin No. 9
The plaintiffs claim that the Commission, in evaluating the subject wetlands, acted arbitrarily and in excess of its authority by virtue of its reliance exclusively on, and misuse of, DEP Bulletin No. 9, issued by the Connecticut Department of Environmental Protection. This Bulletin is titled "Method for Evaluation of Inland Wetlands in Connecticut, a Watershed Approach". Using the methodology outlined in the Bulletin, one has a list of 14 functional values, eg., "Wildlife Habitat"; in comparing wetlands in a given watershed numbers are assigned for each functional value in a wetland and a proper comparison would be between the numerical score assigned one function of a given wetland with the numerical score for the same function in another wetland in the same watershed. (See ROR 30). Plaintiffs assert that the applicant misused Bulletin No. 9 in its presentation to the Commission, which then compounded the error by accepting such misuse and incorporating it into its deliberations, despite plaintiffs' warning (ROR 47, pp. 89-90). The Applicant's expert, Mr. Klein denied misuse of the Bulletin, asserting that applicant's experts utilized Bulletin No. 9 merely to develop a list of wetland functions. Indeed, applicant's wetlands evaluations were descriptive, rather than numerical. In the Commission's deliberations s, the Chairman used the 14 functions as guidelines for discussion of the subject wetlands. There is nothing in the transcript to it compel the conclusion that the Commission misused DEP Bulletin No. 9 or that if followed no scientific guidance in evaluating the subject wetlands. The plaintiffs have failed to establish, by a fair preponderance of the evidence, that the Commission acted arbitrarily and in excess of its authority in evaluating the subject wetlands.
 Feasible and Prudent Alternatives
The plaintiff alleges that the applicant failed to show the absence of feasible and prudent alternatives to the proposed project. Our Supreme Court has defined "feasible" in this context to mean "sound from an engineering standpoint", while "prudent" signifies "economically reasonable in light of the social benefits derived from the applicant's activity",Samperi v. Inland Wetlands Agency, 226 Conn. 579, 595.
In the course of its deliberation on the proposal on March 13, 1997, the Commission discussed alternatives. The Chairman twice read for the CT Page 8100 benefit of his colleagues Section 10.2b of the regulations, which governs consideration of alternatives. Some discussion ensued, including the alternative of maintaining the status quo by denial of the application (transcript, pp. 24ff). Regulations, Section 10.3 requires the explicit finding that all other alternatives are not feasible and prudent, and that the Commission state this finding and the reasons therefore in its decision. However, the failure of the Commission to do so does not render a decision void; rather, the reviewing court must search the record to determine if there is an adequate basis for the Commission's decision. State this finding and the reasons therefore in its decision. However, the failure of the Samperi v. Inland Wetlands Agency, supra, at 589-90. The Commission's decision to approve the subject application constituted an implicit finding that no other feasible and prudent alternatives existed, Id. at 596. If there was substantial evidence in the record to support such a finding then it must stand, id., at 587.
Although the applicable statutes and regulations mandate that the commission consider alternatives to the applicant's proposed action, nowhere is it mandated that the alternatives emanate from the applicants, Red Hill Coalition, Inc. v. ConservationCommission, 212 Conn. 710, 726.
A review of the record shows that various alternatives were put forward for the Commission's consideration, both by the applicant and the intervenor. These alternatives included alternate use of the site and alternate designs for the proposed use. Among the alternatives raised were: elevation of the entire development portion of the site (Environmental Assessment Report, ROR 9, p. 5); "no use", or "no build", discussed by soil scientist Ken Stevens at the hearing of December 12, 1996; a smaller building, with various sizes and configurations proposed, including a two story supermarket, suggested by plaintiff's counsel at the hearing of February 13, 1997. The plaintiffs concede the "no build" alternative is not prudent here. However, plaintiffs claim that Stop Shop introduced no data, no analysis, to support its claims that a smaller store or one differently configured was not economically justified, and thus failed to meet its burden. The court disagrees. "Neither the General Statutes nor the local regulations compel the applicants, sua sponte, to submit formal plans or drawings for all possible alternatives", Red Hill Coalition, Inc. v.Conservation Commission, supra, at 726. The alternatives were discussed by participants in the course of the public hearing. Counsel for Stop Shop summarized his client's position as to suggested alternatives and commissioners raised questions as to alternatives (ROR 47, pp. 138-144). The Commission is not required to consider and CT Page 8101 rule on each and every possible alternative presented to it, Samperiv. Inland Wetland Agency, supra at 590. The commissioners were aware of the issue and free to demand further information from the applicant had they found applicant's analysis inadequate. The court finds there was substantial evidence in the record to support the Commission's implied finding of no feasible and prudent alternatives. The court finds that the plaintiff has failed to establish, by a fair preponderance of the evidence, that the applicant failed to show the absence of prudent and feasible alternatives to the proposed project.
The court finds that the plaintiffs have failed to establish, by a fair preponderance of the evidence, any of the allegations set forth in their appeal.
Accordingly, the relief sought is denied and the appeal is dismissed.
DOWNEY, J.