[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
This is an administrative appeal from a decision of the defendant State of Connecticut, Department of Children and Families ("DCF"), brought pursuant to General Statutes §4-183 et seq. under the Uniform Administrative Procedure Act. DCF had denied the plaintiffs' application for a foster care license. This appeal to the Superior Court followed.
The factual background in this matter is as follows. The plaintiffs. Mark Dailey and Holly Dailey, were licensed as foster parents by DCF in February, 1990. During the time of their licensure, the plaintiffs' relationship with DCF deteriorated, which will be dealt with in more detail later in this opinion. In December, 1995, the plaintiffs' foster care license was scheduled for renewal. The plaintiffs chose not to renew their license. However, on May 6, 1996, the plaintiffs submitted an application for foster care or adoption to DCF. A licensing unit social worker was assigned to the matter who met with the plaintiffs to discuss their past difficulties of cooperating with DCF and to ask about past involvement and difficulties with the Harwinton, Connecticut, school administration. On March 24, 1997, the plaintiffs' application was denied by DCF. On April 7, 1997, the plaintiffs appealed the DCF decision to the administrative hearings unit of DCF. A hearing was held and testimony taken on October 20, November 24, December 1 and December 8, 1997, at the Waterbury regional DCF office. At issue in the hearing was the DCF decision to deny a foster care license to the plaintiffs. The CT Page 449 DCF hearing officer, Robin D. O'Shea, issued her proposed final decision, upholding the denial, on January 7, 1998. On March 3, 1998, Deputy DCF Commissioner Michael L. O'Connor issued his final decision, in which he adopted the proposed final decision of the hearing officer in its entirety, and upheld the DCF denial of the plaintiffs' application for a foster care license. The denial of the plaintiffs' application for a foster care license was upheld on the following grounds:
 (1) That DCF proved that the plaintiffs did not submit the required medical reports for all members of the household in accordance with the Regulations of State Agencies, § 17a-145-143;
 (2) That DCF proved that the plaintiffs violated the Regulations of State Agencies, § 17a-145-144, which requires that foster parents be of good character, habits and reputation;
 (3) That DCF proved that the plaintiffs violated the Regulations of State Agencies, § 17a-145-149, in that they failed to cooperate with DCF's treatment plan for the children.
This administrative appeal to the Superior Court from the DCF decision denying the plaintiffs' foster care license application was timely filed.
This court's "review of an administrative appeal is limited. Our Supreme Court has established a firm standard that is appropriately deferential to agency decision making, yet goes beyond a mere judicial `rubber stamping' of an agency's decisions. Connecticut Light Power v. Dept. of Public UtilitiesControl, 219 Conn. 51, 57, 591 A.2d 1231 (1991); Woodbury WaterCo. v. Public Utilities Commission, 174 Conn. 258, 260,386 A.2d 232 (1978). Courts will not substitute their judgment for that of the agency where substantial evidence exists on the record to support the agency's decision, and where the record reflects that the agency followed appropriate procedures. Samperi v. InlandWetlands Agency, 226 Conn. 579, 587, 628 A.2d 1286 (1993);Lieberman v. State Board of Labor Relations, 216 Conn. 253, 262,579 A.2d 505 (1990); Baerst v. State Board of Education,34 Conn. App. 567, 571, 642 A.2d 76, cert. denied, 230 Court. 915,645 A.2d 1018 (1994)." (Internal quotation marks omitted.) Cabasquiniv. Commissioner of Social Services, 38 Court. App. 522, 525-26, cert. denied, 235 Conn. 906 (1995).
A court "must decide, in view of all of the evidence, whether CT Page 450 the agency, in issuing its order, acted unreasonably, arbitrarily or illegally, or abused its discretion. Ottochian v. Freedom ofInformation Commission, 221 Conn. 393, 397, 604 A.2d 351 (1992). Even as to questions of law, [t]he court's ultimate duty is only to decide whether, in light of the evidence, the [agency] has acted unreasonably, arbitrarily, illegally, or in abuse of its discretion. . . . Conclusions of law reached by the administrative agency must stand if the court determines that they resulted from a correct application of the law to the facts found and could reasonably and logically follow from such facts. . . . New Haven v. Freedom of Information Commission, 205 Court. 767, 774, 535 A.2d 1297 (1988)." (Emphasis in original; internal quotation marks omitted.) Perkins v. Freedom ofInformation Commission, 228 Conn. 158, 164-65 (1993).
In this administrative appeal to the Superior Court, the plaintiffs claim that the hearing officer's decision was clearly erroneous in view of the reliable, probative and substantial evidence and that the hearing officer acted unreasonably, arbitrarily, and in abuse of her discretion.
The hearing officer, in her proposed final decision, made the following findings of fact and conclusions of law:
 1. Mark and Holly Dailey were licensed foster care providers until they voluntarily relinquished their license in October, 1995.
 2. The Daileys cared for Ryan [R.], d.o.b. 12/9/85; Jacqueline [R.], d.o.b. 12/7/86; and Sean [R.], d.o.b. 2/7/88, from March 6, 1992 until October 19, 1995. The [R.] children had a previous voluntary foster care placement with the Daileys in 1990.
 3. The Daileys requested that Sean and Ryan [R.] be removed from their home in April 1995, but requested that Jacqueline be allowed to remain in placement with them.
 4. Mr. and Mrs. Dailey verbally requested licensure as foster parents on May 1, 1996.
 5. The Department informed Mr. and Mrs. Dailey that their foster care license would be denied on May 1, 1996.
 6. The Department agreed to thoroughly review the Dailey's foster care application, and assigned a FTSU social worker to review their file and go through the license process with Mr. and Mrs. Dailey.
CT Page 451
 7. The Daileys did not submit the required documentation which would allow them to be considered and ultimately licensed by the Department to provide foster care.
 8. In January, 1992, Mr. and Mrs. Dailey began to administer Ritalin to Ryan [R.] without prior permission from the child's legal guardian.
 9. Mr. and Mrs. Dailey did not cooperate with the Department's plan for reunification of the children with their mother.
 10. Mr. and Mrs. Dailey did not cooperate with the Department's plan for the children to be removed from their home, despite having agreed to the removal as a settlement to their 1995 Removal Hearing.
 11. Mr. and Mrs. Dailey undermined the efforts of the Department to place the [R.] children in a long term foster home which would assist with the reunification efforts.
 12. Mr. and Mrs. Dailey used both manipulation and implied threats in their dealings with the [R.] children's school, day care and DCF social workers.
(Return of Record ("ROR"), Exhibit 67, p. 17.)
In order to prevail here, the plaintiffs must show that the DCF decision is clearly erroneous and not based on the evidence presented at the hearing. "A finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." (Internal quotation marks omitted.) Pollio v. Conservation Commission,32 Conn. App. 109, 115 (1993), citing Groton v. Yankee Gas ServicesCo., 224 Conn. 675, 691 (1993); Crowell v. Danforth,222 Conn. 150, 156 (1992).
Here, the plaintiffs argue that DCF failed to prove that the plaintiffs did not submit the required medical reports for all members of the household in accordance with Regulations of State Agencies § 17a-145-143. Section 17a-145-143 provides that prior to licensure, applicants shall supply a statement from a physician that each person living in the home has had a physical examination and has been found to be in good health and that the CT Page 452 parents have been determined to be physically and mentally able to provide care to children. The denial letter sent to the plaintiffs is dated March 24, 1997. As of that time, the plaintiffs had failed to submit all of the required documentation for licensure. At the hearing before the hearing officer, Peter DeBassio, the assigned social worker from the foster and adoption services unit, testified that as of the date of his testimony (November 24, 1997), he had yet to receive the required documentation. (ROR, Exhibit 76, transcript 11/24/97, pp. 52-55.) The plaintiff Holly Dailey admitted that she did not submit the required documentation to DCF, however, she contended that she had been told that DCF did not intend to license her home. (ROR, Exhibit 24.) The plaintiffs' point notwithstanding, there is uncontradicted evidence in the record to support the hearing officer's conclusion that the plaintiffs did not submit the documentation necessary for licensure.
The plaintiffs next contend that DCF failed to demonstrate by reliable, probative and substantial evidence that the plaintiffs are not of good character, habits and reputation. The Regulations of State Agencies, § 17a-145-144 requires that foster parents be of good character, habits and reputation.
During the course of the hearing, the state presented testimony of nine witnesses. Most witnesses described situations during which they had been threatened, intimidated or manipulated by one of the plaintiffs. For example, Maureen Villar, School Principal, Harwinton Consolidated School, testified that she felt harassed when Holly Dailey confronted her in a corridor and stated "I hope you can live with yourself. God will get you." (ROR, Exhibit 76, transcript 10/20/97, p. 63.) Similarly, Louise Fiengo, the School Psychologist, described an incident between Dr. Goldman, the Superintendent of Schools, and Holly Dailey stating that: "she shot fire in her eyes, this `how dare you' in the corridor, she shot at him, and she said; `you're despicable.'" (ROR, Exhibit 76, transcript 11/24/97, p. 173.) Additionally, Ms. Fiengo testified that "Holly looked at me with fire in her eyes, `how dare you.'" (ROR, Exhibit 76, transcript 11/24/97, p. 169.)
Indeed, various school personnel, including Ms. Villar, Ms. Fiengo, and Mrs. Dalger, a first grade teacher, all felt intimidated by the plaintiffs as a result of the plaintiffs' behavior. (ROR, Exhibit 76, transcript 11/24/97, pp. 268, 269, 281, 283.) The supervisor of special education services, Mary Dorpalen, frequently heard from Ms. Villar, teachers and other CT Page 453 staff members about their concerns regarding the plaintiffs. (ROR, Exhibit 76, transcript 11/24/97, p. 273.) The school principal knew that the plaintiffs publicly criticized those who disagreed with them and the school psychologist would not meet with Holly Dailey alone because of the plaintiffs manipulative behavior. (ROR, Exhibit 76, transcript 10/20/97, p. 64; transcript 11/24/97, pp. 218-219.) Basically, the witnesses from the school found dealing with the plaintiffs to be a negative experience.
The plaintiffs' implied threats, intimidation and manipulations were not confined to school personnel. Various DCF personnel had similar experiences, both during the time of the placement of the R. children with the plaintiffs and during the licensing procedure. Holly Dailey repeatedly circumvented Wayne Allen, a DCF treatment worker, and went straight to his supervisors. (ROR, Exhibit 76, transcript 10/20/97, p. 82.) Mr. Allen believed that accusations were being made against him and that his reputation was at stake. (ROR, Exhibit 76, transcript 11/24/97, p. 279.) During the licensing procedure itself, Peter DeBassio, a DCF social worker, found somewhat threatening in content and tone, Mrs. Dailey's statement: "We'll go to the State Legislature, the Supreme Court if we have to." (ROR, Exhibit 76, transcript 11/24/97, pp. 20, 82-83.)
Additionally, the hearing officer found that Holly Dailey perceived herself as intimidating these witnesses. In answering the charges levied against her and her husband, Holly Dailey repeatedly stated "we stepped on a lot of toes." (ROR, Exhibit 67, p. 19.)
Additionally, the plaintiffs repeatedly and inappropriately placed the children in adult situations. The plaintiffs improperly shared information with the children and encouraged behavior which undermined the efforts and authority of DCF and the school. Rather than prepare the children for the move from their house, the plaintiffs scared the children about their futures. The plaintiffs told the children that New Britain was a very bad place and used the threat of going to a bad place as a disciplinary tool. (ROR, Exhibit 76, transcript 11/24/97, pp. 178, 208; transcript 10/20/97, pp. 32, 34.) On October 19, 1995, the children were moved to the home of John and Mattie Smith. Mrs. Mattie Smith, a foster parent with, twenty-four years experience, testified of a conversation between Holly Dailey and one of the children in which Holly Dailey stated that the child's mother was a slut, a bitch, a whore, and a drug addict. (ROR, CT Page 454 Exhibit 76, transcript 12/1/97, p. 5.) Holly Dailey made the children fearful of returning to their mother's care. Holly Dailey told Jacqueline R. that she did not have to listen to the Smiths, after the decision was finalized to move the children, and if she misbehaved, she could always come back to their home. (ROR, Exhibit 76, transcript 12/1/97, pp. 6-8, 68.)
Holly Dailey manipulated the children by telling them what to say to Ann Budney, an Independent Child Advocate appointed by DCF. While the R. children did have a right to know what was happening to them in terms of the decision to move them from the plaintiffs' home, the information shared with them about the process was inappropriate. For example, Ann Budney was referred to as "Ann Butts" and her report shared with the children. (ROR, Exhibit 76, transcript 12/1/97, p. 52.) Holly Dailey admitted that she shared sections of Ann Budney's report with the R. children to try to explain why they were being removed. (ROR, Exhibit 76, transcript 12/8/97, p. 30.)
The supervisor of special education services for the Harwinton school district, Mary Dorpalen, testified that when she went to do an assessment of Ryan R. the teacher said to her: ""What should I do? Ryan is all upset because he's been told by Mrs. Dailey, `don't you dare go with Mrs. Dorpalen if she comes down to work with you or to do this reading assessment.'" (ROR, Exhibit 76, transcript 11/24/97, p. 236.)
Thus, there was substantial evidence presented from which the hearing officer could conclude that the plaintiffs' threatening, inappropriate and manipulative behavior violated the DCF regulation which requires that foster parents be of good character, habits and reputation.
Finally, the plaintiffs contend that DCF failed to demonstrate by reliable, probative and substantial evidence that the plaintiffs failed to cooperate with DCF's treatment plan for the R. children. A failure to cooperate in the DCF treatment plan would be a violation of the Regulations of State Agencies §17a-145-149. The hearing officer found three incidents described by the witnesses which supported this finding.
The first incident involved the plaintiffs putting Ryan R. on Ritalin, without prior authorization. Wayne Allen, the DCF treatment worker, testified that he told Holly Dailey that she could not put Ryan on Ritalin because "it had to go in front of CT Page 455 the medical review board." (ROR, Exhibit 76, transcript 10/20/97, p. 72.) While the plaintiffs maintained that they did not attempt to hide anything, the evidence showed that the plaintiffs misunderstood their responsibilities as foster parents and highlights their lack of cooperation with DCF. The Ritalin had been prescribed by a doctor.
The other two incidents on which the hearing officer relied to support this violation of the regulations are related in that both dealt with the plaintiffs' lack of cooperation during the re-placement of the R. children. The plaintiffs refused to assist the DCF social worker on the evening of the children's removal to the Smiths' home. (ROR, Exhibit 76, transcript, 12/1/97, pp. 56-61.) As has been alluded to earlier in this opinion, the plaintiffs spoke in disparaging terms of the children's biological mother. Thus, rather than supporting the children's biological mother, with whom DCF had planned reunification, the children's insecurities about their mother were magnified.
Additionally, the plaintiffs undermined any chance that the Smiths had of becoming a long term placement by telling the children that they did not have to listen to Mr. and Mrs. Smith, and that if they were bad they could come back. Mrs. Smith stated that Holly Dailey told the children to be bad. (ROR, Exhibit 76, transcript 12/1/97, p. 6.)
What is evidenced from the testimony elicited during the hearing is an overall failure to cooperate with the DCF treatment plan for the R. children by the plaintiffs. Clearly, there was substantial evidence in the record to support the hearing officer's determination that the plaintiffs had violated that regulation.
It is true that during the hearing the plaintiffs presented evidence which conflicted with that presented by DCF. However, the mere possibility of drawing two inconsistent conclusions from the evidence presented does not prevent the findings of DCF from being supported by substantial evidence. Newtown v. Keeney,234 Conn. 312, 320 (1995); see Samperi v. Inland Wetlands Agency,226 Conn. 579, 587-88 (1993). This court concludes, on the basis of its review of the record, that there is substantial evidence in the record to support the DCF decision. The fact that there is contrary evidence in the record and that the plaintiffs disagree with the weight accorded the evidence, does not affect the validity of the DCF decision. CT Page 456
Based on all of the foregoing, the plaintiffs' administrative appeal is dismissed.
Michael Hartmere, Judge.